480 So.2d 818 (1985)
Clyde L. VALLERY and Mildred E. Vallery, Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendant-Appellee.
No. 84-309.
Court of Appeal of Louisiana, Third Circuit.
November 15, 1985.
Writ Denied February 7, 1986.
Fuhrer, Flournoy & Hunter, Philip G. Hunter, Alexandria, for plaintiffs-appellants.
Jerry L. Finley, Baton Rouge, and Chris J. Roy, Alexandria, for defendant-appellee.
Before DOMENGEAUX, DOUCET and KING, JJ.
KING, Judge.
The issue presented by this appeal is whether or not the State of Louisiana is liable for the damages incurred as a result of the collision of two automobiles at a newly constructed highway intersection.
The plaintiffs in this case are Clyde L. Vallery (hereinafter Vallery), and his mother, *819 Mildred E. Vallery, who was a guest passenger in Vallery's car. The plaintiffs sued Johnny Robert (hereinafter Robert), the driver of the other vehicle, his automobile insurer, State Farm Mutual Insurance Company, the State of Louisiana, through the Department of Transportation and Development (hereinafter the DOTD), and Buchart Horn Engineers, the designers of the intersection. Robert filed a reconventional demand and third party demand against Vallery, his automobile liability insurer, MFA Mutual Insurance Company, the DOTD, and Buchart Horn Engineers. The DOTD filed answers denying liability to Clyde L. Vallery, Mildred E. Vallery, and Johnny Robert and also filed third party demands against both Clyde L. Vallery and Johnny Robert and both of their automobile liability insurers. Prior to trial, Clyde L. Vallery, Mildred E. Vallery, and Robert settled their claims against Buchart Horn Engineers. Also prior to trial, Clyde L. Vallery, his insurer, MFA Mutual Insurance Company, Mildred E. Vallery, Johnny Robert, and his insurer, State Farm Mutual Insurance Company, settled their claims against each other. Thus the sole issue before the trial court was whether the DOTD was liable for the damages incurred by Clyde L. Vallery, Mildred E. Vallery and Johnny Robert.
The trial court found that the DOTD was neither negligent nor strictly liable to the Vallerys and Robert and dismissed their suits against the DOTD. Only Clyde L. Vallery and Mildred E. Vallery appeal this decision. None of the other parties have appealed so the trial court decision is final as to them. For the reasons hereinafter set forth we affirm.

FACTS
On December 4, 1980 Clyde L. Vallery and his mother, Mildred E. Vallery, were driving southbound on U.S. Highway 167 in Rapides Parish, Louisiana at approximately 7:15 P.M. The roadway was dark. Meanwhile Johnny Robert was driving southeast on U.S. Highway 71. Both cars were approaching a newly constructed intersection where Vallery had the right-of-way on U.S. Highway 167 and Robert had to stop on U.S. Highway 71, pursuant to a stop sign, before entering U.S. Highway 71. When Robert arrived at the intersection of the two highways, he brought his car to a complete stop at the stop sign. Robert looked both ways and then proceeded into the intersection. At this moment, Vallery's vehicle was only three or four car lengths away and traveling approximately 50 miles per hour. Vallery did not have time to take evasive action and he collided with Robert's automobile striking it on the driver's side at the left rear. Both Clyde L. Vallery and Mildred E. Vallery were injured as a result of the collision.
The sole issue on appeal is whether the trial court erred in not finding the DOTD liable to Clyde L. Vallery and Mildred E. Vallery because of its finding that the sole proximate cause of the accident was the negligence of Johnny Robert.
In this regard the Vallerys contend that the DOTD was negligent in the design, construction, signing and placing of traffic controls at the intersection as well as in its failure to adequately warn motorists of the hazardous nature of the intersection. The Vallerys also contend that the DOTD is strictly liable because the intersection was defective; that is, it occasioned an unreasonable risk of injury to others. Whether we apply a negligence analysis or a strict liability analysis to the facts of this case, the result is the same. The record does not support a finding that the design, construction, or signing of the intersection was a cause in fact of the accident.
The intersection in question had just been opened to traffic on November 17, 1980 and was a four-way intersection with the two highways crossing at basically right angles. Prior to this new intersection's completion, U.S. Highway 167 and U.S. Highway 71 met at a T-type intersection and were both two lane highways. Drivers traveling on U.S. Highway 71 had the right-of-way and drivers on U.S. Highway 167 had to stop at a stop sign before entering U.S. Highway 71. During this *820 time a flashing beacon flashed amber to the vehicles on U.S. Highway 71 and red to vehicles on U.S. Highway 167. Buck Morton, the DOTD's District Traffic Operations Engineer, explained that the flashing beacon was originally installed because the old intersection was considered unusually dangerous because any drivers failing to stop on U.S. Highway 167 at the old intersection would crash into the woods and hills due to the position of the old intersection. Approximately one year prior to this accident, the DOTD began rebuilding the intersection and widening U.S. Highway 167 into a four lane highway. During the construction, there was heavy construction equipment operating along the sides of the intersection and occasionally on the traveled lanes themselves. At times, parts of the shoulders at the intersection were ripped up leaving 12" dropoffs during some phases of the construction. Due to the hazards produced by these construction activities at the intersection, the flashing beacon was changed to flash red to traffic entering at all three entrances to the intersection and large interstate-size stop signs were installed at all three entrances as well. Once construction was completed and the modern cross-type intersection was opened, the flashing beacon was removed as unnecessary and the stop signs governing U.S. Highway 167 were removed to grant vehicles traveling on this new four lane portion of U.S. Highway 167 the rightof-way. The stop signs governing U.S. Highway 71 were left in place since drivers on U.S. Highway 71 were required to stop and give the right-of-way to drivers traveling on the new four lane U.S. Highway 167.
Mr. Morton, who was responsible for the signing and traffic control for the intersection, described the pertinent traffic signs and controls governing Robert's approach to the intersection as follows: (1) At 2500 feet from the intersection a sign stating "Junction U.S. 167 One Mile;" (2) at 1100 feet from the intersection a sign stating "STOP AHEAD;" (3) at 900 feet from the intersection a sign stating "Junction U.S. 167" and "Junction LA. 3026;" (4) a sign stating "Junction U.S. 167 to the left and straight ahead;" (5) next is a cluster sign stating "U.S. 71 straight ahead" and "LA 3026 to the right;" and (6) a large "STOP" sign. Mr. Morton also described the pertinent traffic signs governing Vallery's approach on U.S. 167 southbound as follows: (1) A sign stating "Junction U.S. 71 ONE MILE;" (2) at 2800 feet from the intersection a pictorial sign depicting the highway's change from two lanes to four lanes; (3) at 930 feet from the intersection a sign stating "Junction U.S. 71" and "Junction LA 3026;" and (4) at 400 feet from the intersection a cluster sign stating "LA 3026 straight ahead," "U.S. 167 to the left" and "U.S. 71 to the right."
Mr. Morton visited the intersection every day for the first two weeks after its opening. He observed that approximately fifty percent of the motorists traveling on U.S. Highway 71 were running the stop signs at the intersection. He noticed that a good percentage of the people who ran the stop signs were employees of Dresser Industries, which was located nearby, who drove through the intersection every day and who knew that the stop signs were there. To alleviate the danger caused by motorists ignoring the stop signs, Mr. Morton requested the State Police to monitor the intersection and enforce the stop signs by giving traffic tickets to violators.
The Vallery's traffic expert, Duane Evans, testified that the intersection was hazardous because of inadequate signing, driver confusion over the changing of the rightof-way, the high percentage of drivers running the stop signs and an excessive 55 mile per hour speed limit on U.S. Highway 167. Mr. Evans testified that the speed limit should have been 35 miles per hour and that motorists should have been warned that the intersection was dangerous and the right-of-way changed. To accomplish this, he would have required the posting of signs stating "DANGEROUS INTERSECTION AHEAD" and "RIGHT OF WAY CHANGED." He also testified that the flashing beacon should have been maintained at the new intersection flashing *821 amber to drivers on U.S. Highway 167 who have the right-of-way and red to drivers on U.S. Highway 71 who have the duty to stop at the intersection. He believed that these measures would have significantly reduced the risk of injury. Mr. Evans admitted on cross examination that Mr. Morton's methods in signing the intersection were not substandard or in violation of any traffic engineering rules.
Mr. Morton explained the decisions as to signing and speed limits at trial. He testified that the flashing beacon was removed because the new cross-type intersection eliminated the unusual physical hazards presented by the old T-type intersection which originally justified the use of the flashing beacon. He explained that if the flashing beacons were installed at every intersection, they would lose their effectiveness in warning the public of truly dangerous intersections which require extra caution. Mr. Morton also stated that motorists were warned that they were approaching the intersection by numerous junction signs. In addition, Mr. Morton explained that the accepted method of changing a right-of-way is to install stop signs controlling all lanes of traffic for at least thirty days and then removing the stop signs from the lanes that are now granted the right-of-way. Mr. Morton stated that the DOTD complied with this procedure in changing the right-of-way at the new intersection. He left the speed limit on U.S. Highway 167 at 55 miles per hour because it worked fine under the old T-type intersection. Since this new cross-type intersection was better designed, he saw no reason to lower the speed limit at the opening of the new intersection.
An expert witness for the DOTD, Dr. Ned Walton, who is a traffic engineer with a PhD in transportation and human factors engineering, stated that after reviewing the intersection during the day and night, it was his professional opinion that the signing utilized at the intersection was adequate for the safe operation of motor vehicles. He testified that from the spot where Robert stopped at the stop sign, a motorist could see an automobile approaching from 600 feet away. He testified that once this new intersection was opened there was no need for a flashing beacon as they were used to warn of unexpected roadway conditions. He also stated that the speed limits at the intersection were appropriate in light of the old intersection and the design of the roadway. Furthermore, Dr. Walton testified that the method used by the DOTD in changing the right-ofway was "just as appropriate as it could be" and that he knew of no better way to accomplish the reversal of a right-of-way. He also stated that he never heard of anyone using a "Change of Right of Way" sign as suggested by Mr. Evans. Dr. Walton added that a "Change of Right of Way" sign might confuse motorists rather than aid them in navigating the intersection. Dr. Walton agreed with Mr. Evans and Mr. Morton that the high percentage of motorists running the stop signs created a hazardous condition. However, he noted that this was a police enforcement problem not related to the design or signing of the intersection. Finally, Dr. Walton stated that in his opinion traffic control at the intersection had nothing to do with the accident which he thought was caused by Robert's failure to see the Vallery vehicle and pulling out in front of it.
In determining whether the DOTD has met its duty to the motoring public, the fact that the signing of the intersection might have been improved does not render the department derelict in the discharge of its duty. Beeson v. State, through Dept. of Transp. & Dev., 400 So.2d 278 (La.App. 3rd Cir.1981), writ denied 404 So.2d 1257 (La.1981); Norris v. State, 337 So.2d 257 (La.App. 3rd Cir.1976). The DOTD is not held to a standard of perfection. This court in Siler v. Guillotte, 410 So.2d 1265 (La.App. 3rd Cir.1982), quoted from Doucet v. State, Department of Highways, 309 So.2d 382 (La.App. 3rd Cir.1975), writ refused, 312 So.2d 340 (La.1975) and described the duty owed to motorists by the DOTD as follows:

*822 "The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. It is liable for damages only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it. Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3 Cir. 1974); Dupre v. Louisiana Department of Highways, 154 So.2d 579 (La.App. 3 Cir.1963); Mistich v. Matthaei, 277 So.2d 239 (La.App. 4 Cir.1973); St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273 (1964)." Siler v. Guillotte, 410 So.2d 1265, at page 1270 (La.App. 3rd Cir. 1982).
In Hebert v. Travelers Insurance Company, 179 So.2d 513 (La.App. 3rd Cir.1965), our court described the duty that a motorist owes when he is confronted with a stop sign as follows:
"When a motorist is confronted with a stop sign, legally located at an intersection, it is his duty to bring his vehicle to a complete stop, to appraise traffic in the intersecting street, and to make certain that the way is clear for him to make a safe passage across the intersection before he enters it. When a motorist stops his vehicle before entering a right-of-way street, he has performed only half of the duty which the law has imposed upon him. To stop and then proceed in the immediate path of oncoming vehicles constitutes gross negligence...." (Citations omitted.) Hebert v. Travelers Insurance Company, 179 So.2d 513, at page 517 (La.App. 3rd Cir.1965).
See also McIntyre v. Government Emp. Ins. Co., 413 So.2d 174 (La.App. 4th Cir. 1982).
At trial Robert testified that he saw the stop sign at the intersection and came to a complete stop. State Trooper Richard Jillson and Roger Harrison both witnessed the accident and corroborated Robert's testimony that he executed a complete stop at the stop sign. Robert stated that he looked both ways, saw nothing, and proceeded into the intersection where he was broadsided by the Vallery vehicle. Robert could not explain why he failed to see the Vallery automobile; however, he testified that he would have remained stopped had he seen the Vallery automobile approaching. The only evidence in the record from which it might be argued that the DOTD's conduct, or the intersection itself, was substandard in any way was the fact that a large number of the motorists were apparently running the stop signs on U.S. Highway 71 at its intersection with U.S. Highway 167. We note that even if this intersection was substandard, because of design and warning, that such substandard condition could have no causal effect in this case since it is uncontraverted that Robert came to a complete stop at the stop sign before proceeding into the path of the Vallery automobile.
After a close review of the record, we find that the trial court was correct in finding that the accident was caused by the sole negligence of Robert in entering the intersection in the immediate path of the Vallery automobile. See Canter v. Koehring Company, 283 So.2d 716 (La.1973); and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiffs-appellants.
AFFIRMED.