522 So.2d 1288 (1988)
David DILL and Anna Dill
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
No. 87-CA-708.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1988.
*1289 Chaisson & Chaisson, Destrehan, for plaintiffs/appellees.
William J. Doran, Jr., Sp. Asst. to General Counsel, State of La., Dept. of Transp. and Development, Baton Rouge, for defendants/appellants.
Before BOWES, GRISBAUM and GOTHARD, JJ.
GOTHARD, Judge.
Defendant-appellant, the Louisiana Department of Transportation and Development, appeals a judgment of the trial court finding DOTD solely at fault and awarding plaintiffs damages as a result of a motor vehicle accident.
This matter arose out of a two car accident which happened at milepost 5 on La. Hwy. 48 (locally known as Brown's Curve on River Road) on July 18, 1985, at approximately 12:05 p.m. in St. Charles Parish, Louisiana. The plaintiffs, Mr. and Mrs. David Dill, were proceeding down river in an easterly direction with the curve being to their left. The other party involved in the accident, Warren C. Savoie, was proceeding *1290 up river in a generally westerly direction with the curve being to his right and the levee being to his left. It was lightly raining and the roadway was wet. While attempting to negotiate the curve, Mr. Savoie, who was then going the posted speed limit of 30 miles per hour, felt the back end of his car start to slide. Savoie lightly applied his brakes to slow down a little more and he regained control of his car. Since he had drifted somewhat into the easterly lane, however, the plaintiffs' vehicle impacted with his at the center of the curve in the plaintiffs' lane with both vehicles remaining at the point of impact. At trial, Mr. Savoie testified that he was attentive and his vision clear and that he travelled this roadway often; however, he could not avoid the accident once he went into the slide.
The plaintiffs were injured in the crash, Mrs. Dill more severely. Mr. Dill suffered a deep laceration of the scalp which required stitches. Mrs. Dill's injuries resulted in a fracture of the cervical odontoid C-2, fractures of six left ribs, and synovitis of the right knee. Mrs. Dill's injuries resulted in a 5% permanent anatomical disability and a 50% permanent functional disability to her whole body. As a consequence of Mrs. Dill's fractured neck, surgery was necessary to install a device called a halo, in order to immobilize the patient's upper torso neck and head, to allow the break to heal. Additional surgery was needed to remove the halo, after which, on October 17, 1985, Mrs. Dill was fitted with a Philadelphia collar. The Philadelphia collar was removed on December 12, 1985. At present Mrs. Dill must wear a soft cervical collar during situations where there is a possibility of reinjury, such as riding in a car. Mrs. Dill continues to suffer from dizziness. The synovitis of the right knee has left residual pain and discomfort to Mrs. Dill when walking, bending, and descending or ascending stairs.
During Mrs. Dill's convalescence, it was discovered that Mr. Dill had cancer which required surgery.
After finding DOTD 100% at fault,[1] the trial court made the following awards: (1) Mrs. Dill$237,297.60$200,000 for the pain and suffering associated with the broken neck bone; $15,000 for the pain and suffering associated with the six broken ribs; $10,000 for the pain and suffering associated with the knee injury; and reimbursement of medicals; (2) Mr. Dill$40,287.50$10,000 for the pain and suffering associated with the head injury; $30,000 for loss of consortium; and $287.50 for medical bills.
On appeal, DOTD assigned six specifications of error dealing with the trial court's assessment of liability and damages in two arguments. The plaintiffs answered the appeal urging an increase in their award of damages. Basically, DOTD's appeal requires us to determine the following two issues: (1) Was La. Hwy. 48 defective and, if so, was this defect solely or partially the cause of the accident, and (2) Were the awards made to plaintiffs excessive?
LIABILITY
Two theories were presented at trial as to the cause of the accident: (1) Driver fault (argued by DOTD's expert); and, (2) Defective roadway (expounded by plaintiffs' expert). The trial judge chose to accept the latter explanation of the accident.
On appeal, DOTD contends that at the time of the accident, the substandard roadway at Brown's Curve was properly marked with an advance curve 30 mile per hour advisory speed sign and flashing amber beacon. As such, the roadway's condition, according to DOTD, did not constitute a defect; the sole cause of the accident was the fault of Mr. Savoie in that he was inattentive, or exceeding a safe speed for the existing road and weather conditions. Since the trial judge's findings were completely contrary to DOTD's position, in order for appellant to prevail, it must demonstrate that the trial court was manifestly erroneous in its factual determinations, *1291 LSA-C.C.Art. 2324.1; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), and also that the court abused its much discretion in making its damage awards. Reck v. Stevens, 373 So.2d 498 (La.1979).
LA. 48 is a two-lane, 20 foot wide bituminous surfaced rural highway. At the time of the accident it was classified as a Class 2 Arterial Type Highway on the basis of an approximate 11,000 traffic volume per day. The applicable state highway standards published by DOTD as introduced through the expert's testimony require a degree of curvature at Brown's Curve approximately one-half of that presently existing. These standards further require a twelve foot lane width and a four foot shoulder, rather than the ten foot lane width and narrow unsurfaced shoulders at Brown's Curve. The superelevation or banking in the curve's westbound lane (which is the cross slope used in a curve to compensate for the curvature) was measured and found to be substandard for lack of a constant rate throughout the curve which produced a wavy surface and fluctuating coefficient of friction. There is considerable wear, pot marks, cracking, and deterioration of the roadway in the westbound lane, especially bad at the right hand wheel path.
The ball-bank indicator test which measures side force as a vehicle travels around a curve indicated that Brown's Curve was correctly posted with a 30 mile per hour advisory speed in each direction under dry weather conditions. The critical speed or speed at which a vehicle negotiating the curve would slide was estimated at 45-50 miles per hour by DOTD's expert witness, Olin K. Dart. The plaintiffs' expert witness, Duane T. Evans, estimated the critical speed at 38-41 miles per hour assuming a uniform surface and condition, but at 30 miles per hour in consideration of the severe degree of curvature, lane width, superelevation, wear of roadway, and wet pavement.[2] In Mr. Evans' opinion the fluctuating rate of superelevation and the pot marked and wet pavement of the curve caused a loss of the coefficient of friction which combined with the severe degree of curvature and narrow road width to cause Mr. Savoie's vehicle to slide into the eastbound lane. In Mr. Dart's opinion it was possible that the Savoie vehicle slid at 30 miles per hour due to the roadway conditions as described by Mr. Evans, but he thought it would take some steering input from the driver to cause the critical condition. Mr. Dart felt that the deficient roadway conditions at this curve were not sufficient to cause any serious decline in friction available to a vehicle going through the curve, that the curve actually had enough friction so that no superelevation was needed to hold a vehicle on the curve, and that a vehicle's suspension system would compensate for the bumps and potmarks on the roadway.
DOTD is not an insurer of the safety of all motorists on the road, but it has the duty to maintain the roads and highways in a reasonably safe condition for a reasonably prudent driver. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). The duty to maintain reasonably safe highways extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition. Sinitiere v. Lavergne, supra. This duty imposed on DOTD is the same under either strict liability or negligence. See Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982); Efferson v. State, Through T. and Dev., 463 So.2d 1342 (La.App. 1 Cir. 1984), writs denied, 465 So.2d 722 (1985). Whether the Department has breached a duty, that is, whether the roadway at the scene of the accident was an unreasonably dangerous condition will depend upon the particular facts and circumstances of each case. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986).
The St. Charles Parish Sheriff's Office produced a total of 72 accident reports of accidents occurring on LA. 48 at *1292 Brown's Curve from January 1, 1978 to July 2, 1985. Twenty-three of these accidents occurred in 1984 with approximately ten occurring in the west bound lane in the same way as the instant accident, three at 35 miles per hour, one at 15 miles per hour, and one at 25 miles per hour. Deputy Joey Chaisson testified that the St. Charles Parish Sheriff's Office records contained only accidents reported by the St. Charles Parish Sheriff's Office, not accidents reported by Louisiana State Police. He also testified that copies of all St. Charles Parish Sheriff's Office accident reports are sent to Louisiana State Police Headquarters, which in turn supplies that information to the Highway Safety commission and the DOTD.
Also introduced at trial was a report dated May 18, 1982, prepared by Boyd T. Gautreaux, District Traffic Operations Engineer, District Two, DOTD, regarding Brown's Curve, which states:
Accident date compiled by Department personnel from information provided by the State Police revealed that a total of 23 accidents occurred in this vicinity during the three year period between January 1, 1978 and January 1, 1981. Of these, 12 accidents were run-off-the-road, six were sideswipes (opposite direction) and three were head-on collisions. Nine of these accidents occurred at night, eight occurred in wet weather, and 14 involved personal injury.
This particular location presents an abrupt change in horizontal alignment between two relatively straight sections of roadway. Although warning signs are posted there appears to be a problem of driver expectancy associated with this curve. The current accident pattern can be expected to worsen when the new Luling-Destrehan bridge is opened and traffic volumes increase as the area develops. This location is also the object of many citizen complaints received by this office.
Considering the accident frequency and expected increase in traffic volumes at this location, it is recommended that Brown's Curve be reconstructed to provide a more favorable alignment. Acquisition of right-of-way for this project will be necessary, but with the exception of fence relocation, no structures would be affected.
Attached to the report is a cost estimate for realigning Brown's Curve of $164,000. In response to this report, DOTD initiated State Project No. 282-02-31, to realign Brown's Curve and decrease the existing degree of curvature of Brown's Curve by approximately one-half, from 12° 30', to 60° 30'. In addition, plaintiffs' expert, Mr. Evans, offered his opinion that the curve could be easily widened by putting drainage pipes in the ditches and then widening the shoulders and roadbeds which would make the curve less dangerous.
Also introduced at trial was various correspondence from the St. Charles Parish President's Office in which the DOTD was advised of the dangerous conditions which exist on Brown's Curve.
The trial judge concluded, on the basis of the evidence and the testimony of the witnesses, including the experts, that:
".. the cause in fact of the accident was the defective condition of the roadway... [and that] the number of accidents... damages ... lawsuits ... and the requests by parish officials for state officials to repair the roadway, no other conclusion is plausible...."
In this connection, the trial judge, in a written opinion stated as follows:
"... a severe degree of curvature existed along with a superelevation of the curve ... in conjunction with a wet, worn pavement, all tended to prove that the condition of the highway contributed to the accident ... the collision was not one of heavy impact. The experts categorized the accident as a slow-speed collision. Testimony of other accidents was introduced ... The Boyd T. Gautreaux report of 1982, indicates that Brown's Curve is indeed a dangerous curve ... Mr. Dill ... was not negligent ... Mr. Savoie was driving ... the designated speed limit. Yet due to the curvature his vehicle went into the opposite lane and collided with the Dill vehicle ... In conclusion, *1293 I find 100% fault attributable to DOTD."
DOTD's expert placed the cause of the accident on the driver, citing driver error, and DOTD asks this court to apply a presumption of negligence to Mr. Savoie because he was ticketed for failure to maintain control of his vehicle and he pled guilty. DOTD argues that despite the substandard road condition of Brown's Curve that DOTD discharged its obligation to the motoring public by posting adequate warning devices to alert the ordinary motorists to the conditions in existence. DOTD's argument fails to demonstrate how the conclusion reached by the trial judge was clearly wrong. Both plaintiffs' vehicle and Mr. Savoie's were being operated at the posted speed limit (each driver testified that he was attentive and his vision clear), yet Mr. Savoie's vehicle began to slide into the eastbound lane as he entered the curve. The evidence shows that the roadway of Brown's Curve was substandard in curvature, superelevation, and was worn, pot marked, and cracked, especially bad in the westbound lane in which Mr. Savoie's vehicle was traveling. Mr. Evans explained that with these roadway conditions and the wetness of the pavement, that sliding would occur at the posted speed limit of 30 miles per hour. Although DOTD's expert disagreed, the trial judge found it more probative than DOTD's theory of the cause of the accident.
The lay testimony and the theory set forth by the plaintiffs' expert "furnishes a reasonable factual basis for the trial court's finding ... and reasonable inference of fact should not be disturbed upon review." Canter v. Koehring Co., 283 So. 2d 716 (La.1973). Therefore, we hold the trial court's finding of 100 percent liability against DOTD is correct.
DAMAGES
DOTD claims that the awards given plaintiffs were excessive. Plaintiffs claim they were inadequate.
As to Mr. Dill, the trial court's opinion provided:
... Mr. David Dill received a large cut on the forehead. He was also taken to RPMC ... His claim consists of personal injuries and loss of consortium.
The total medicals from RPMC regarding David Dill amount to $287.50. As to pain and suffering sustained in the accident, this Court is of the opinion that a general damage award of $10,000.00 would be adequate.
The loss of consortium proves more difficult to assess. Mr. Dill had to live without the services of his wife. It was around the time in question that David Dill learned that he had cancer. Obviously, this dreaded disease is unrelated to the accident.
Without any doubt, the outer parameters of the loss of his wife's services would be from July 18, 1985, until October 30, 1986. Said loss of services was more pronounced during the period that Mr. Dill had to undergo cancer surgery without the assistance of his spouse.
In summary, 15 months total were involved. It could safely be said that for approximately one year, Mr. Dill was deprived of his wife's ability to assist him in his needs brought on by cancer.... Deep, emotional wounding usually results. Wounding is more pronounced when a dreaded disease raises its ugly head and a need for help arises. This Court is of the opinion that a verdict of $30,000.00 would be fair and adequate.
As to Mrs. Dill, the trial court's opinion provided:
Following the accident, Mrs. Dill was immediately transported to RPMC and treated by Dr. V.J. Zeringue....
Dr. Zeringue is an orthopedic surgeon. He first saw Mrs. Dill in the emergency room where x-rays and evaluations indicated a fracture of the left chest ribs 5, 6, 7, 8, 9, and 10. The fracture of the spine was the major injury.... C-2, a bone in the cervical spine, has a bony prominence which projects upwards. The bony projection is called an odontoid. The odontoid acts as a pivot for the bone above the C-2 level. It acts as a post, and C-1 fits over this bony projection in a manner that allows C-1 to be held *1294 stable over the spinal cord. Rotation is thus permitted.
The doctor further explains that if the bony prominence is broken, the spine becomes unstable. With the foregoing instability, there exists a possibility of an abnormal shifting of C-1 which could compress the spinal cord resulting in paralysis and possible death to the patient.
The break in the odontoid of the C-2 was at the base of the odontoid. Treatment consisted of immediate immobilization requiring the use of a Philadelphia cervical collar. Several days later, on July 23, 1985, Mrs. Dill underwent surgery. Following this procedure, a "halo" device was installed on Mrs. Dill by screwing sharp screws through a ring and down into the skull bone and then attaching the ring to a chest support in order to support the cervical spine and immobilize the patient....
The rib fractures were from cortex to cortex with minimal displacement requiring no surgical procedures. Mrs. Dill was advised to rest, and conservative management was used.
Mrs. Dill was released from the hospital on August 2, 1985. Although ambulatory, she remained on muscle relaxants and medication. Home health care was provided Mrs. Dill until September 12, 1985, as there were many activities she was unable to perform. For example, sleeping became a chore and was accomplished by the use of a reclining chair.
When the "halo" device was removed from Mrs. Dill on October 17, 1985, it was replaced with the Philadelphia collar for continued cervical support. It should be noted that Mrs. Dill sustained facial scarring due to the removal of the four screws on the "halo" device, two in the back of her head hidden from view by the growth of hair, and two on the front side just below the hairline. On December 12, 1985, a soft cervical collar was recommended by Dr. Zeringue to replace the Philadelphia collar. Use of the soft collar was discontinued on or about February 6, 1986.
Evidence of Mrs. Dill's right knee injury was still present on February 2, 1986. This injury finally resolved itself by July 1, 1986 ...
Dr. Zeringue opines that the injury to Mrs. Dill's cervical spine makes her more susceptible to reinjury. She was indicated to have a 5% anatomical disability and a 50% functional disability in this regard ... Mrs. Dill complains of occasional dizziness which the doctor ascribes to the use of the "halo" device. At present, he believes further surgery will not be required.
The knee injury in and of itself was painful, and this discomfort made it difficult for Mrs. Dill to walk properly. For pain and suffering, I am of the opinion that an award of $10,000.00 is adequate for this resolved injury.
The rib fractures were also painful, and I am of the opinion that an award for pain and suffering in the amount of $15,000.00 would be fair for this resolved injury.
The foregoing, coupled with the spinal fracture, increases the pain in the neck. The likelihood of death or the uncertainty thereof causes great alarm. Most people with a so-called "broken neck" die. While not categorized as the foregoing, it is my opinion that the same amount of pain was and is experienced by Mrs. Dill.
This Court is impressed with the testimony of Mrs. Dill and sympathizes with her frustration. Being immobilized and in severe pain is serious enough, but to learn that one's mate has cancer at the same must have made Mrs. Dill feel helpless at a time she was obviously needed.
I am of the opinion that an award for pain and suffering in the amount of $200,000.00 is fair under these set of circumstances.
Both sides have cited us to other quantum cases for purposes of comparison under Reck v. Stevens, supra. Reck permits us to refer to a scale of prior awards only if the instant award is an abuse of discretion and the prior injuries are truly similar. Since we have found no abuse of discretion as regards Mrs. Dill's awards, nor as regards Mr. Dill's award for loss of consortium we will not discuss the cases cited as *1295 to these injuries. We have studied them, and other cases however, and note that the awards given here fall within the scale of prior awards. See, Villavaso v. State Farm Mut. Auto. Ins. Co., 424 So.2d 536 (La.App. 4 Cir.1982); Scott v. Hospital Service Dist. No. 1, 496 So.2d 270 (La.1986). Moreover, the awards do not appear to be an "abuse of discretion", and for this reason, we affirm the trial court awards for Mrs. Dill's general damages and Mr. Dill's award for loss of consortium. However, as to Mr. Dill's award for the scalp laceration, we find an abuse of discretion. In accordance with out review of the record and recent cases of similar injury, we feel general damages of $5,000.00 is the highest point reasonably within the discretion of the trial court, which is the amount suggested by the appellant DOTD. Accordingly, we reduce this award of general damages for the scalp laceration suffered by Mr. Dill to $5,000.00.
Therefore, for the foregoing reasons, we affirm the trial court's judgment except to amend the award of damages to Mr. Dill for his scalp laceration from $10,000.00 to $5,000.00.
REVISED AND AFFIRMED AS REVISED.
BOWES, Judge, dissenting.
I must respectfully dissent from the well-written opinion of my brothers. I acknowledge that La. Hwy. 48 at milepost 5 was not constructed as a modern highway and is in need of repair. However, the State was aware of these things and designated that section of the roadway for reconstruction. Before this could be accomplished, the State took every reasonable precaution, in my opinion, to warn motorists of the possible danger in this area. They posted large signs, reducing the speed limit from the normal 35 m.p.h. limit for other sections of River Road to 30 m.p.h., on the mounting for the curve sign; they also put up large chevrons, and placed a flashing light to get the attention of motorists and to warn them of the "sharp curve" condition of the roadway. They also placed a yellow "no passing" line in the curve.
Another important factor that I believe has been overlooked by the majority is that the record proves unequivocally that both motorists were thoroughly familiar with the roadway, having driven it many, many times, and, as experienced drivers through this area, should have been aware that driving at the posted speed limit could only be accomplished safely when normal and safe driving conditions prevail. At the time of the accident, it was raining and the road was wet and slippery. Mr. Savoie was not only ticketed by the police for failure to maintain control of his vehicle, but he also pled guilty to those charges.
Under these circumstances, I cannot find that the State should be found responsible when, in my opinion, enough warning devices had been placed at that location to warn all but the most inattentive drivers. If the roadway was the cause in fact for the instant accident, then all automobiles traveling at that particular location at that particular time would have had a problem staying on the roadway, and logic tells us there would have been many accidents. However, although plaintiffs provide us with statistics which indicate a relatively large number of accidents have taken place in the past at that location, the record is silent and there is absolutely no mention as to any others that took place on the day in question.
The major allegations against the DOTD are that the roadway was narrow, that it had narrow shoulders and that, somehow, this existing condition was a causative factor in this accident. The trial court, in its reasons for judgment, relied on the testimony of Mr. Duaine Evans, the plaintiff's expert, and concluded that because there was a severe degree of curvature in conjunction with a wet, worn, pavement that all of this tended to prove that the condition of the highway contributed to the accident. However, the court seemed to completely ignore the testimony of Mr. Olin Dart, DOTD's expert, whose long-standing *1296 qualifications in this field are eminent. The court also indicated that the Department recognized it as a dangerous curve, but did not ever address the question of whether or not the actions of the Department in placing all of the additional warnings on the curve would have been sufficient to warn a reasonably prudent motorist of the nature of the curve.
In my view, the court also did not adequately address the issue of driver error, especially under the weather conditions existing, and did not properly apply the jurisprudence which provides for a presumption of negligence when a driver is in the wrong lane of traffic and when he pleads guilty to a traffic violation which was the proximate cause of the accident. The court seemed to place more emphasis on the fact that the roadway is not up to modern day standards, which is the same issue that our Supreme Court addressed in the case of Myers v. State Farm Mutual Automobile Insurance Co., 493 So.2d 1170 (La.1986) and the line of cases cited therein. Our jurisprudence has recognized that the failure of a public body, such as the State Department of Transportation, to update all of its highways to current standards does not establish the existence of a hazardous defect or prove that the subject roadway is unreasonably dangerous. Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4 Cir.1981); writ denied 404 So.2d 1259 (La.1981); Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La. App. 3 Cir.1974), writs refused 309 So.2d 341 (La.1975).
Our courts have also recognized that, when hazardous conditions exist, the DOTD may discharge this obligation to the motoring public by posting adequate warning devices that are sufficient to alert the ordinary motorist to the conditions in existence. See Gadman v. State, through Department of Transportation and Development, 493 So.2d 661 (La.App. 2 Cir.1986), Opinion modified 497 So.2d 1001 (La.1986); Kitchen v. Duke's Escort Service, 493 So. 2d 829 (La.App. 2 Cir.1986); Booth v. Potashnick Construction Co., 420 So.2d 512 (La.App. 2 Cir.1982), writ denied, 423 So.2d 1183 (La.1982); Vallery v. State, through Department of Transportation and Development, 480 So.2d 818 (La.App. 3 Cir. 1985); writ denied, 481 So.2d 1350 (La. 1986); Richardson v. Continental Insurance Company, 468 So.2d 675 (La.App. 3 Cir.1985); writ denied, 474 So.2d 1304 (La. 1985); Ponder v. Groendyke Transport, Inc., 454 So.2d 823 (La.App. 3 Cir.1984); writ denied, 457 So.2d 1195 (La.1984); writ denied, 457 So.2d 1198 (La.1984); Chiasson v. Whitney, 427 So.2d 470 (La.App. 5 Cir. 1983); writ denied 433 So.2d. 179 (La.1983); writ denied 433 So.2d 180 (La.1983) and writ denied 433 So.2d 183 (La.1983).
It seems obvious to me from a reading of the entire record that the major fault found with the DOTD was in the failure to reconstruct that roadway to modern day standards. The record clearly reflects that the Department had, in fact, planned to reconstruct certain segments of this roadway, but that this reconstruction had not yet taken place at the time of the accident. Meanwhile, the Department has taken every considerablee step to adequately mark the curve to warn reasonably prudent and attentive drivers of the roadway conditions.
The roadway conditions in the instant case are almost exactly parallel those conditions as described in the recent Supreme Court case of Myers v. State Farm Mutual Automobile Insurance Company, 493 So. 2d 1170 (La.1986):
The physical characteristics of Greenwell Springs Road are not unique. Many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. Dr. Olin K. Dart, an expert in civil and traffic engineering and in accident reconstruction, testified that it would be physically and financially impossible to bring all of the State's roads up to modern standards. Mr. Hickey also believed that the State could not possibly meet such a burden. We agree. For this reason, the failure of DOTD to reconstruct *1297 the State's highways to meet modern standards does not establish the existence of a hazardous defect. Dagnall v. Louisiana Department of Highways, 426 So.2d 276 (La.App. 4th Cir.), cert denied, 433 So.2d 160 (La.1983); Devall v. Morgan, 424 So.2d 522 (La.App. 5th Cir.1982), cert. denied, 427 So.2d 1214 (1983); Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4th Cir.), cert. denied, 404 So.2d 1259 (La. 1981). Id. at Page 1173.
In the instant case, the Department had taken reasonable steps and certainly the warnings in place on the date of the accident were adequate to warn a reasonably prudent driver of the roadway conditions. In my opinion, this roadway did not present an unreasonable risk of harm to a driver exercising ordinary care and reasonable prudence, and especially this is applicable to this local driver who, according to the record, was extremely familiar with this curve, so there was no question of his being "surprised" by its condition.
Our jurisprudence has consistently held that the Department of Transportation and Development is not responsible for every accident that occurs on state highways, nor is it an insurer of the safety of persons traveling thereon. The Department is only liable in cases where the state highway is unreasonably unsafe for persons exercising ordinary care and reasonable prudence. See Doucet v. State of Louisiana, Department of Highway, 309 So.2d 382 (La.App. 3 Cir.1975); writ denied 312 So.2d 340 (La. 1975); Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3 Cir. 1974); writ denied 303 So.2d. 182 (La.1974).
In addition, in the instance case, we have the presumption of negligence on the part of the driver who had crossed the center line and who has pleaded guilty to a traffic citation. In this case, Mr. Savoie, who was formerly a defendant, was charged with failure to maintain control of his vehicle. This is covered in Louisiana R.S. 32:58 which provides that it is unlawful for a driver of any vehicle to negligently fail to maintain reasonable and proper control of his vehicle while it is operated on the public roads of the state. The evidence shows that Mr. Savoie has pled guilty to this offense, which brings this matter under the provisions of Louisiana R.S. 13:3739, which provides that proof of conviction shall create a rebuttable presumption in civil actions that the party in fact committed those acts essential to the commission of the offense. The record fails to reflect to me that this presumption was rebutted, nor did the trial judge find so.
In addition, our courts have consistently held that a person who crosses the center line, and is in an accident in the opposite lane of travel, is presumed to be negligent and bears the burden of exonerating himself from his presumed negligence. See Simon v. Ford Motor Company, 282 So.2d 126 (La.1973); Brannon v. Shelter Mutual Insurance Company, 507 So.2d 194 (La. 1987).
In my opinion, the roadway in question on the date of the accident with the warning devices in place did not present an unreasonable risk of harm to this particular local driver, who was very familiar with this curve, if he had been exercising ordinary care and reasonable prudence under the prevailing circumstances. Proximate cause of the accident and any resulting damages to the plaintiffs was the admitted negligence of Mr. Savoie. I would reverse the trial court's finding of liability on the part of the State of Louisiana, Department of Transportation and Development dismissing plaintiffs' case against this defendant.
Accordingly, I respectfully dissent.
NOTES
[1] Prior to trial, plaintiffs settled their claim against Warren Savoie, and DOTD entered into a consent judgment with Mr. Savoie dismissing with prejudice DOTD's third party demand against him.
[2] Mr. Evans defined safe speed as that speed at which most drivers should have no problems negotiating a curve under most conditions as compared to critical speed which is the speed at which, if exceeded, a vehicle will slide. Critical speed is normally calculated for the worst conditions, including wet conditions.