588 So.2d 737 (1991)
Dr. Richard D. PALMER
v.
GOUDCHAUX/MAISON BLANCHE, INC.
No. 91-CA-214.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 1991.
Writ Denied January 6, 1992.
*738 Leon H. Rittenberg, Jr., Larry C. Becnel, Catherine Lemann, Jerome J. Pellerin, Polack, Rosenberg, Rittenberg & Endom, New Orleans, for plaintiffs-appellees.
John G. Gomila, Jr., New Orleans, for defendant-appellant.
Before DUFRESNE and WICKER, JJ., and FINK, J. Pro Tem.
*739 DUFRESNE, Judge.
This is an appeal by Godchaux/Maison Blanche, Inc., defendant-appellant, from a jury award of $3,100,700, in favor of Dr. Richard D. Palmer and his wife Maria for injuries suffered by Dr. Palmer when he was wrestled to the floor, handcuffed, and detained by a security guard at appellant's department store. Because we find the award excessive, we reduce it to $2,120,700. In all other respects, the judgment is affirmed.
The incident giving rise to this suit occurred at appellant's department store on April 12, 1988. Dr. Palmer testified that on his way to pick up his children at school he stopped at the store to buy some socks. When he presented his store credit card, the sales clerk appeared somewhat discomforted, and a short while later a man in an L.S.U. sweat shirt appeared. This person was later identified as Keith Bowen, a store security guard. Bowen stated to plaintiff that the credit card had been reported stolen, and asked him to produce further identification, which he did. After some further discussion, plaintiff told Bowen that the store could keep the socks and the card, and that he was leaving to pick up his children. As he was walking toward the door, he looked back and saw that Bowen was chasing him. He testified that Bowen raised his right hand either to grab or strike him and at that point plaintiff also raised his right arm to either strike or push Bowen. Bowen testified that plaintiff actually struck the first blow, after which he struck back. In any case, Bowen stated that he wrestled plaintiff to the floor and held him down with his legs in a "scissors grip". At that point at least one other security guard appeared, plaintiff was handcuffed behind his back, and led through the store to the security office. He was detained until the police arrived and was released.
Dr. Palmer filed suit against appellant alleging that at the time of the incident he was successfully recovering from a lumbar spinal fusion operation, and that during the battery by appellant's agent, this fusion was irreparably disrupted, rendering him substantially disabled. He sought damages for past and future earnings, medical expenses and general damages. His wife, Dr. Maria Palmer, sought damages for loss of consortium.
At trial, appellant stipulated to liability, and the only issue for the jury was therefore the extent of damages. Plaintiff offered his and his wife's testimony, the video-taped depositions of Keith Bowen and Dr. John Jackson, his treating surgeon, the expert economic testimony of Dr. Melville Wolfson, and a video-tape of a part of the incident itself made by the store's security video camera. Appellant's case consisted only of the expert economic testimony of Dr. Kenneth Boudreaux.
After hearing the evidence, the jury fixed damages as follows:

Richard D. Palmer
Past Economic Loss $ 208,000
Future Economic Loss $ 1,500,000
Past Medical Expenses $ 10,700
Future Medical Expenses $ 32,000
Loss of Enjoyment of Life $ 500,000
Pain, Suffering & Physical
Disability (Past & Future) $ 500,000
Embarrassment, Humiliation
& Mental Anguish $ 250,000
 ___________
 Total $ 3,000,700
Maria A. Palmer
 Loss of Consortium,
 Service and Society $ 100,000

Goudchaux/Maison Blanche, Inc. now appeals this judgment urging nine assignments of error, only two of which we find meritorious. We first address those assignments which we reject.
Appellant first urges that its motion for a mistrial should have been granted on the grounds of prejudicial comments by a prospective juror during voir dire. During general questioning of the venire about lawsuits in which they or their families had been parties, one person stated that her brother-in-law had been a party to a suit involving an injury to his back and in her opinion the result of that suit had been unsatisfactory to him. During jury selection, *740 six jurors had been empaneled when the above person's name was called. Both parties stated to the court that they urged no challenge to her, at which point she initiated the following colloquy:
Juror: With all due respect to everybody, with everything that was done to my brother-in-law, I really don't think I am proper for this case.
Court: What do you mean, with everything that was done to your brother-in-law?
Juror: The company that was at question is Maison Blanche.
Court: Well, I am really confused. Your brother-in-law was injured?
Juror: Yes.
Court: And Maison Blanche was a defendant?
Juror: Yes they were.
The juror was then excused by the court with the concurrence of all parties. Appellant moved for a mistrial and a bench conference was held. The trial judge denied the motion being of the opinion that his jury charge would contain the instructions that (a) only evidence presented by the parties could be considered, and (b) that all parties are entitled to be treated equally, and (c) that prejudice or punishment were not proper considerations for the jury in fixing damages. He also noted that the six jurors already empaneled appeared to him to be fair minded and reasonable, and that he did not find the comments at issue to be such as to warrant the drastic measure of a mistrial.
In Streeter v. Sears, Roebuck and Co., Inc., 533 So.2d 54 (La.App. 3rd Cir.1988), the court noted that granting or denying a motion for a mistrial is within the sound discretion of the trial judge, and that although the Code of Civil Procedure does not specifically provide this remedy, our jurisprudence has approved of its use when a trial judge determines that the interests of justice would be served thereby. In the present case, the information offered by the juror was nothing more than her apparently candid opinion that she might not be a disinterested judge of the case because of her brother-in-law's experience with the defendant company. No details of the prior suit were given, nor did she attempt to prejudice or inflame the other jurors against this party. Considering these circumstances, we find nothing to suggest that the trial judge abused his discretion in denying the motion, nor indeed that the interests of justice toward appellant were adversely affected by his ruling.
Appellant's second argument is that admission into evidence of the security camera video-tape of the incident, and still frames taken from the tape, was also error because its stipulation as to liability rendered the tape irrelevant; alternatively it argues that even if the tape were relevant, its probative value was outweighed by its prejudicial effect, citing La.Code Evid., art. 403. We disagree. As appellant correctly points out, the tape begins while plaintiff is at the counter with the sales clerk and effectively ends when Bowen's right arm is raised, after which point a post obstructs the ensuing struggle. The trial judge reviewed the tape and ruled it admissible because he found it relevant to the issue of what damages Dr. Palmer suffered from this incident. He also rejected appellant's argument that even if relevant the tape was inflamatory.
Under La.Code Evid., art. 103(A), "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected...." The jurisprudence interpreting the similar Fed.Rule Evid, 103(a) holds that rulings on admissibility of evidence are entrusted to the broad discretion of the trial judge, and such rulings will be reversed on appeal only if a substantial right of a party is affected, Muzyka v. Remington Arms Co., Inc., 774 F.2d 1309 (5th Cir.1985).
In the present case, we do not find that the trial judge abused his discretion in ruling that the tape was relevant. Plaintiff testified as to his version of events and the tape corroborated that version up to the point when Bowen reached him. Moreover, as the trial judge noted, the video-tape was a visual recording of at least some of the events for which plaintiff was seeking damages and it was thus clearly relevant to the jury's determination of what actually transpired. *741 As to the issue of prejudice, we find none that could possibly have outweighed the probative value of the tape or otherwise adversely affect any substantial right of appellant even were the tape deemed irrelevant because of the stipulation to liability. We therefore reject this allegation of error.
The third and fifth alleged errors concern jury instructions and the special verdict form submitted to the jury. The record shows that no objection was timely made at trial on either of these issues as per La.Code Civ.Pro. arts. 1793(C) and 1812(B), see also Streeter v. Sears, Roebuck and Co., Inc., supra. These questions may not, therefore, be considered on appeal.
As its sixth assignment of error, appellant urges that it was prejudiced by the trial judge permitting plaintiff to make reference in closing argument to the fact that it did not call as a witness Dr. Robert Applebaum, a "may call" medical expert listed in its pre-trial order. This issue arose because by the close of evidence this expert's name had twice been mentioned. The first was during voir dire when appellant was questioning jurors about their possible relationship with this prospective witness. The second was when Dr. Jackson, plaintiff's expert, mentioned that he had reviewed x-rays taken by Dr. Applebaum; he did not, however, give any indication that these films were made in conjunction with a medical examination by this doctor on appellant's behalf. Prior to argument, plaintiff requested a jury charge to the effect that failure of a party to call a witness identified with that party gives rise to an inference that this person's testimony would have been adverse to that party's position. The trial judge sustained appellant's objection to this charge on grounds that the witness was equally available to both parties, but refused to preclude reference to the witness by plaintiff in closing argument. Appellant contends that this ruling led to prejudicial error, and cites in support thereof the following excerpts from plaintiff's argument:
"... Maybe, maybe if they brought a medical expert into this courtroom, he would take that witness stand and take an oath, swear to tell the truth and tell you that he agrees with Dr. Jackson.
* * * * * *
... Where is Dr. Applebaum? What is it that he said, perhaps in his deposition, that the defendant didn't want him to say at trial? Where is the truth, Maison Blanche? Give it to us"
In its closing, appellant offered, by way of explanation, that its choice of Dr. Applebaum as an expert was a mistake in that this doctor declined to give an opinion on matters relevant to the case because he did not do fusion surgery. In response, plaintiff argued:
"... I forgot that Dr. Applebaum doesn't do fusions. It sounds like a Steve Martin joke."
Of these three excerpts, the first is permissible comment on the lack of evidence. The second, although problematical, is simply speculation about the absence of a witness whose name had been mentioned on two prior occasions. The third is nothing more than an assessment of the believability of appellant's explanation as to why the witness was not called. We thus find nothing in these passages which would lead us to conclude that the trial judge abused his discretion in permitting this argument. Moreover, even could it be said that plaintiff's argument were somehow improper, any such impropriety was cured by the jury instruction that argument of counsel was not evidence in the case, Streeter v. Sears Roebuck and Co., Inc., supra.
All remaining assignment of error concern quantum, and their resolution requires a particularized analysis of the injuries suffered by Dr. Palmer. At the time of the incident, plaintiff was 46 years old and married with four children ages 10 to 21. He is also a board certified neurologist, as is his wife Maria Palmer. Until 1986, plaintiff was a full time practicing neurologist who shared an office with his wife. In that year he discovered that he had congenital spondylolysis, a condition which can cause *742 slippage between the spine and the sacrum. While exercising he heard a click in his back, apparently from such a slippage. As a result, in August, 1986, he underwent a fusion operation which involved the insertion of a metal rod to stabilize the spine. However, this surgery was a failure.
Plaintiff consulted Dr. John Jackson, and in February, 1987, a second surgery was performed. Dr. Jackson described this second procedure as follows. The metal rod was removed and another fusion was done involving the placing of bone fragments in the disc space. Holes were drilled in the sacrum through which a wire was run, and the wire was then wrapped around the spinous process of the fourth lumbar vertebra. The purpose of the wire was to prevent motion at the site of the bone grafts, thus permitting them to solidify. Dr. Jackson testified that by early 1988 he had every indication that this fusion would be a complete success and that plaintiff would soon have been able to return to a full medical practice. Plaintiff testified that by early April, 1988, he was jogging quite a bit, and was doing extensive swimming. He noted that his pain had almost disappeared and that he shortly intended to return to full-time practice.
Dr. Jackson reported that he examined plaintiff on April 21, 1988, and found extreme tenderness and muscle spasms in the lumbar spine, and the patient reported extreme pain. He determined at that time that the spinous process holding the wires had been fractured during the scuffle, thus permitting movement at the site of the fusion, and this movement in turn had disrupted the bone fusion process. He hoped that the fracture would eventually heal and that the fusion would again go forward, but after a year there appeared to be no progress. In March, 1989, he decided that the continued motion in the fracture was causing extensive pain and that the only way to alleviate this pain was to remove the wire. After this surgery, there was still considerable pain, especially on exertion, but plaintiff's condition was improved.
His diagnosis at the time of trial was chronic disabling pain syndrome, which rendered plaintiff unable to conduct a full medical practice. His further opinion was that another fusion surgery was almost inevitable, but that the prognosis for such a procedure was poor because the previous operations had resulted in the formation of scar tissue which would prevent full recovery. His conclusion was that even with this additional surgery, plaintiff would never be able to return to a full medical practice, and he would continue to suffer pain in his back.
Returning to appellant's arguments as to quantum, it first urges that an award of $32,000 for future medicals was mere speculation. We disagree. Dr. Jackson stated that his fee for a future operation, that in his opinion was inevitable, would be about $8,000, and while he wasn't sure about hospital costs, these generally were about three times the surgeon's fee. As this was the only evidence presented to the jury we find no error in the jury making an award based on the doctor's estimate, Riley v. Winn Dixie, 489 So.2d 931 (La.App. 5th Cir., 1986).
Appellant next contends that the awards of $208,000 for past wages and $1,500,000 for future wages constitute an abuse of the jury's discretion. Again we disagree. As to the past loss of $208,000, this was the figure supplied by appellant's own economic expert, Dr. Boudreaux. Appellant argues, nonetheless, that this amount was based on assumptions not substantiated by the evidence. Particularly, it suggests that this expert assumed that even without the incident in question, there was no showing that plaintiff's practice would have grown to his full potential by October, 1988, as assumed in the expert's hypothetical. While it is true that plaintiff testified that it might take as long as one or two years to fully restore his practice, it is also true that in closing argument appellant urged the jury to assume the six-month rebuilding period as follows:
[Plaintiff] said he would've been back to full worktake thatassume that, six months later. Boudreaux calculates the past [loss] at two-hundred and eight thousand dollars. *743 Considering this argument, and the fact that Dr. Wolf son had given a range for this loss of between $284,000 and $432,000, we conclude that there was no abuse of discretion by the jury in making this award.
As to future wages, a plaintiff must prove this item of damages with reasonable certainty, but not with mathematical certainty, Whatley v. Regional Transit Authority, 563 So.2d 1194 (La.App. 4th cir. 1990). In the present case, there was ample evidence from which the jury could have concluded that $1,500,000 was the proper award for this item.
Dr. Wolfson utilized plaintiff's business records from May, 1983, through early 1990, and arrived at estimates of future lost wages based on the following analysis. From 1983 to early 1986, plaintiff's wife was earning a little over $100,000 per year, and he was earning about 90% of that figure in their joint practice. This ratio of earnings remained fairly constant until the first few months of 1986, but began to diverge sharply at about the time plaintiff first experienced problems with his back and eventually underwent his first surgery of August, 1986. Plaintiff's earnings dropped substantially during the remainder of 1986 and 1987, but by early 1988 he was able to earn about $4,000 per month working part time, and at the time of trial was also earning about this amount. Between 1986 and 1990, however, Maria Palmer's earnings had gone from about $125,000, to over $300,000 per year. Dr. Wolfson further noted that because this joint practice operated out of the same facility, the basic expenses of that facility had to be met whether one or two physicians were using it, and that were plaintiff practicing full time there, the additional expense would be only about 3% of his earnings.
To arrive at his figures for future loss, Dr. Wolfson thus assumed that plaintiff's income would have continued to track that of his wife at about the 90% ratio. He calculated work life expectancy, subtracted 3% expenses, and discounted these totals by a factor of 8.3%. His final figures ranged from $3,280,000 if plaintiff were unable to work at all, to $2,761,000 if plaintiff were able to earn $48,000 per year.
Dr. Boudreaux, on the other hand, disputed use of the 90% ratio and used instead a 2½% to 5% annual salary increase based on pre-1986 surgery earning. He also rejected the 3% expense factor and using A.M.A. data regarding the expense ration for a neurologist, arrived at a 35% figure. Using similar work life expectancy figures and a discount rate of 8.5%, he arrived at $913,000 if plaintiff did not work, and $653,000 at $48,000 per year.
Dr. Wolfson was then asked to recalculate his figure based on a 35% expense factor and earnings of $48,000 per year, and this figure was $1,600,000.
Appellant's major point here is that the 90% ratio between the earnings of Dr. Maria Palmer and her husband as a basis for projected earnings is without foundation. It urges instead that the increase in Dr. Maria Palmer's earnings was attributable to her taking on additional work to make up for her husband's loss of earning capacity. While Dr. Maria Palmer did admit to working longer hours, she further testified that the growth of her practice was the result of a substantial increase in the number of medical facilities in the area and the consequent increase in the number of patients needing neurologists. She further stated that although she and her husband practiced together, they saw different patients, and that the growth of her practice was not the result of her simply taking over her husband's former patients.
Considering all of this evidence, it is this court's opinion that there was more than a sufficient factual basis for the jury award for future lost wages.
The final issues before us are the general damage award of $1,250,000 to plaintiff and the loss of consortium award of $100,000 to his wife. For the following reasons, we find that the jury abused its discretion in making these awards on the particular facts of this case in that they are excessive. In Reck v. Stevens, 373 So.2d 498 (La.1979), the court ruled that on review of damage award the initial inquiry must always be directed at whether the *744 award for the particular injuries and their effect upon the particular person is a clear abuse of the trier of fact's much discretion. Further, only after an articulated analysis of the facts discloses an abuse of discretion that the award may be considered excessive. Finally, only after a determination has been made that there has been an abuse of discretion, may the reviewing court look to other factually similar cases as an aid in determining the highest award that could reasonably have been made on the particular facts of the case under review.
The general nature of plaintiff's injuries and resulting disability have previously been set forth and thus need not be repeated in detail here. We do note, however, the following pertinent facts. We (as obviously did the jury) accept plaintiff's and his physician's testimony that without the incident he would have recovered completely from his prior surgeries and would have been free of pain. We also accept as true that because of the incident he suffers from chronic low back pain syndrome and that even with future surgery this condition will persist. However, plaintiff also testified that he is able to work at least part time. Although he is unable to participate in physical activities which he once enjoyed, with his family, on the other hand he is not completely debilitated or bed-ridden. While plaintiff alluded to mental stress and depression, there was no evidence that he ever sought treatment for these conditions. Neither was there evidence to suggest that his conjugal relations with his wife were affected or that their marriage was jeopardized by his injuries. Further, although he remains in pain, this pain is not of such severity as to cause him to undergo surgery at this time. We finally note that he was the victim of a battery of some severity and was led through the store in handcuffs and detained for the better part of an hour.
Giving due consideration to the nature of the incident, as well as to the impact it has had on plaintiff's life, we find that the general damage award of $1,250,000 is clearly an abuse of the jury's much discretion.
Having so found, our next task is to determine what is the highest amount, on the particular facts before us, which the jury could reasonably have awarded without abusing its discretion. At this point we may seek guidance from prior awards in similar cases, ever mindful of course that these other cases aren't factually similar to the one now before us.
In Joseph v. Ford Motor Company, 499 So.2d 428 (La.App. 4th Cir.1986), plaintiff received a lumbar spine injury in a vehicular collision. After conservative treatment was unsuccessful, plaintiff underwent a double laminectomy at the L4-L5, L5-S1 levels. After a period of convalescence, the plaintiff attempted to exercise and "his back gave out again" Id., at 430. His doctor then fitted him with a back brace which was not helpful and, as of the time of trial, his physician was recommending a spinal fusion, although the physician indicated that it still may not relieve plaintiff's pain. Plaintiff was found to be unemployable and to have suffered from post-traumatic stress disorder and depression. Plaintiff was unable to work up until the time of trial and was no longer able to participate in sports or play with his children. He had significant emotional injury, with strains on his personal relationships which led him to counselling to overcome his stress and anxiety. A total of $1,700,000 was awarded in a lump sum at trial, in addition to certain amounts dealing with the return of the purchase price of the allegedly defective vehicle. The Fourth Circuit found that the "highest reasonable amount which adequately compensates plaintiff" was $350,000, and the judgment was reduced accordingly.
In Champagne v. Lee, 470 So.2d 378 (La.App. 5th Cir.1985), plaintiff was involved in a vehicular collision and, because she was six months pregnant at the time, was unable to have x-rays or pain medication until after the delivery of her child. After conservative treatment did not provide any relief, she underwent a CT scan which revealed a bulging disc at L-5, S-1, *745 as a result of which a laminectomy was performed. She continued to have difficulty, after which she underwent a lumbar discogram, which revealed a recurring herniated disc at the same level caused by instability. A repeat laminectomy was performed, along with a lumbar fusion at L-5, S-1. As of the time of trial, plaintiff testified that she still suffered pain, was unable to walk or stand for prolonged periods of time and could not return to work for the foreseeable future. She had difficulty raising her two children. Her recreational life was non-existent and she was unable to have sexual relations with her husband. After reviewing the jurisprudence to determine the maximum permissible award, the court of appeal reduced plaintiff's general damage award to $350,000.
In Runnels v. Esteves, 550 So.2d 1225 (La.App. 4th Cir.1989), the plaintiff was a 31 year old mother of two, employed at a bank. As a result of an automobile collision, plaintiff underwent a discectomy at C-5-6 and at L-4-5. The total medical treatment involved four hospitalizations, two surgeries, a 15% anatomic disability and 100% functional disability as to work outside the home. Her outlook was for residual pain and limited movement, inability to engage in pre-accident activities, trouble sleeping and fears of crowds and driving and a diminished sex life. The court held that a $300,000 general damage award was neither excessive nor an abuse of discretion.
In Rodriguez v. Traylor, 487 So.2d 124 (La.App. 4th Cir.1986), plaintiff suffered injury to her back and neck and underwent cervical and lumbar myelograms, after which a CT scan revealed a tear at the L-4, L-5 disc. The torn disc was removed, as was the L-5, S-1 disc, which was also found to be damaged. Plaintiff continued to have problems and after additional lumbar and cervical myelograms, plaintiff underwent a second surgical procedure to remove the torn disc at C-5, C-6. She was later found to have a urological disorder caused by irritation in the spinal cord. She underwent a third operation to free the nerves to her legs and bladder, but continued to have pain in her lower back, right hip, head and neck. She was also totally disabled. As of the time of trial, additional testing was recommended but had not as yet been performed. The Court of Appeal found that an award of $200,000 in general damages was appropriate.
In all of the above cases there were at least two spinal surgeries, except for Joseph v. Ford Motor Company, where a second surgery was recommended. All involved residual pain and either total or substantial disability, and all except Rodriguez v. Traylor, involved significant emotional and/or sexual problems. On the other hand, none of these cases involved an intentional injury. Nonetheless, in considering these prior awards, and with attention to the particular facts in the case before us, we conclude that the highest award for general damages that could have been made by the jury without abusing its much discretion is $350,000, and we hereby amend the judgment to so reflect.
As to the $100,000 award to plaintiff's wife for loss of consortium, we likewise find an abuse of discretion. The evidence on this issue was as follows. Plaintiff testified that because of his injury, his wife had begun working longer hours to make up for his lost income, and was additionally burdened by his inability to give much attention to his two younger pre-teen children. His wife testified that she and her husband did few things as a family since the incident. Neither testified that their marriage had been strained or had otherwise deteriorated because of the injury, nor was there any evidence to show that plaintiff required any unusual care or nursing from his wife.
Our review of other cases shows awards in the $5,000 to $20,000 range except for a few cases where there was a serious disruption of family or sexual relations, or where there existed some other compelling circumstance, see e.g. Dill v. State Dept. of Trans. and Dev., 522 So.2d 1288 (La.App. 5th Cir.1988); Tracy v. Jefferson Parish, 523 So.2d 266 (La.App. 5th Cir.1988).
In the present case, our review of the facts shows that the maximum award that *746 the jury could have made without abusing its discretion is $20,000 for Maria Palmer's loss of consortium, and we so fix that award.
For the foregoing reasons, we reduce the general damage award to plaintiff from $1,250,000 to $350,000, and reduce the award for loss of consortium in favor of his wife from $100,000 to $20,000. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.