609 So.2d 330 (1992)
Keith Paul LOUGON
v.
ERA AVIATION, INC., Aerospatiale, Societe Nationale Industrielle, Aerospatiaile Helicopter Corporation, Detroit Diesel Allison, Inc., and Chuck Johnson, Defendants-Appellants,
Randolphe Jimmie Saunier and Rhonda Saunier, Intervenors-Appellees,
Randolphe Jimmie Saunier, Intervenor-Appellant.
No. 91-723.
Court of Appeal of Louisiana, Third Circuit.
November 19, 1992.
Rehearing Denied December 22, 1992.
*332 Steven Broussard, Lake Charles, for plaintiff-appellant.
Jones, Jones & Alexander, J.B. Jones, Jr., Cameron, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald Collins, Wm. Joyce, New Orleans, for defendant-appellantAerospatiale.
Carmouche Firm, David Frohn, Lake Charles, for defendant-appellantU.S. Fire Ins.
Before STOKER and YELVERTON, JJ., and COREIL[*], J. Pro Tem.
STOKER, Judge.
This is a suit for personal injury damages allegedly sustained when an Aerospatiale helicopter crashed into the Gulf of Mexico on November 4, 1988. The parties stipulated to liability, and the case was tried before a jury on the issue of quantum. Randolphe Jimmie Saunier (plaintiff) and Aerospatiale Helicopter Corporation and Aerospatiale, Societe Nationale Industrielle (defendants) appeal.

PROCEDURAL BACKGROUND
Keith Paul Lougon filed a suit for personal injury damages allegedly sustained in the November 4, 1988 helicopter crash. Randolphe Jimmie Saunier and his wife, Rhonda Saunier, filed a petition of intervention for damages they sustained in the same helicopter accident. Lougon and the Sauniers named as defendants: (1) Era Aviation, Inc., the owner and operator of the helicopter involved in the accident; (2) Chuck Johnson, the Executive Vice President of Era Aviation, Inc. and the manager of the Gulf Coast Division; (3) Aerospatiale Helicopter Corp., the assembler and distributor of the helicopter; (4) Aerospatiale, Societe *333 Nationale Industrielle, the manufacturer of the helicopter; (5) Aetna Casualty and Surety Co., the liability insurer for both Era Aviation, Inc. and Chuck Johnson; and (6) Allison Gas Turbine Division, manufacturer of the tail rotor shaft on the helicopter. Prior to trial, Lougon settled his claims and filed a motion to dismiss his suit which was granted on July 9, 1990.
The Sauniers and the defendants entered into a stipulation prior to trial, in which the Sauniers agreed in part to seek only compensatory damages, to dismiss with prejudice all defendants other than Aerospatiale Helicopter Corp., Aerospatiale, Societe Nationale Industrielle, and their insurers, and to conduct no further discovery on the issue of liability in consideration for the agreement in part by Aerospatiale Helicopter Corp., Aerospatiale, Societe Nationale Industrielle, and their insurers not to contest liability.
Accordingly, the suit between the Sauniers and Aerospatiale Helicopter Corp., Aerospatiale, Societe Nationale Industrielle, and its insurers was tried before a jury on November 26, 1990, on the issue of quantum. On November 28, 1990, the jury returned the following verdict:

"VERDICT SHEET
"1. What amount of damages will adequately compensate each of the following plaintiffs for losses proven to result from this incident?

RANDOLPHE JIMMIE SAUNIER:
a) Pain and suffering; both physical
 and mental $275,000.00
b) Physical Disability $150,000.00
c) Past Lost Earnings $ 35,000.00
d) Future Lost Earnings $760,000.00
e) Medical Expenses $ 40,000.00
RHONDA SAUNIER:
Loss of consortium, services and society? $ 50,000.00"

The defendants then filed a motion for a new trial or in the alternative, a remittitur. The trial court ordered remittitur only on the issue of loss of future wages, finding that the evidence could not support an award of more than $200,000. Saunier accepted the remittitur in lieu of a new trial.

Defendants' Appeal
Defendants filed an appeal. In their original brief, the defendants presented the following issues for our review:
1. Whether the plaintiffs proved that Saunier's left knee injuries were caused by the helicopter crash;
2. Whether the award to Saunier for pain and suffering in the amount of $275,000, coupled with the award for physical disability in the amount of $150,000, was excessive, and whether the separate award for disability was proper;
3. Whether the $50,000 award to Mrs. Saunier for loss of consortium was excessive;
4. Whether the $200,000 reformed judgment for loss of future income was excessive;
5. Whether the trial court erred in admitting certain photographs of Saunier into evidence; and
6. Whether the trial court erred in failing to grant a mistrial after the plaintiffs' counsel suggested to the jury an allegedly impermissible method for calculating pain and suffering and after the plaintiffs' counsel argued "loss of enjoyment of life" as an element of damage when this element was not listed in the trial court's jury charges or on the verdict sheet.

Randolphe Jimmie Saunier's Appeal
Mr. Saunier also filed an appeal. The plaintiffs submitted an original brief which included a response as appellees to the defendants' appeal and the appeal on behalf of Saunier. Saunier listed the following issues for our review:
1. Whether the trial court had the authority to consider a remittitur for loss of future wages which is to be "entered only if the issue of quantum is clearly and fairly separable from other issues in the case" LSA-C.C.P. art. 1814; and
*334 2. Whether the jury abused its discretion in awarding $760,000 in loss of future wages, such that if the jury did not abuse its discretion, the trial court erred in ordering a remittitur.

Other Issues Raised
The parties also filed the following motions with this court. The plaintiffs filed an alternative motion to remand, based on the alleged development of new medical evidence that was not available at the time of trial. Through this motion, the plaintiffs urge that, in the event that we do not reinstate the jury's award for loss of future wages, we remand the case to the trial court for the presentation of medical evidence concerning Saunier's condition in order to determine whether or not the original jury award for loss of future wages should be reinstated and to order the defendants to pay Saunier's new related medical expenses. The defendants filed a motion to strike the plaintiffs' alternative motion to remand.
The defendants filed a supplemental brief in which they addressed the issues concerning the plaintiffs' counsel's closing arguments, which issues were raised but not briefed in their original brief. The plaintiffs then filed a motion to strike the defendants' supplemental brief. For reasons to be explained later, these motions will not be granted.
We reinstate the jury verdict with respect to damages for future loss of wages of Randolphe Jimmie Saunier and affirm the judgment in his favor. We amend the judgment in favor of Rhonda Saunier to reduce her award to $25,000.

FACTS
Saunier was employed by Mobil Oil Corp. as an offshore meter tender. On November 4, 1988, Saunier was working on "West Cameron 617", an offshore platform located on the Gulf of Mexico. On that date, Saunier boarded the Aerospatiale helicopter to go to "West Cameron 609", a platform about three miles away.
Immediately after lift off, the helicopter crashed in the Gulf. Four of the six occupants of the helicopter died in the accident. Saunier and Lougon were the only two survivors.
Saunier was transported to St. Patrick's Hospital in Lake Charles. Dr. Ronald Kober, a general surgeon, Dr. Ralph Colpitts, a plastic surgeon, and Dr. Thomas Ford, an orthopedic surgeon, saw Saunier when he arrived at the hospital. Evaluation of Saunier at that time revealed multiple injuries including:
1. Multiple lacerations of the face, including a stellate laceration, which began over his nose and extended up into his upper eyelid and across his eyebrow, and a laceration above his left eyelid which was about five and a half to six centimeters long; one of the facial lacerations damaged Saunier's supraorbital nerve (a sensory nerve) resulting in a permanent numbness to that area;
2. a fracture of the orbital floor of his left eye;
3. a large laceration of his left forearm which was heavily contaminated with particulate matter of plastic and metal;
4. a LeForte II fracture, which Dr. Colpitts described as "fracture that goes through the facial bones and actually goes through the nasal pyramid and exits through the maxilla (jawbone)";
5. a fracture of the left elbow;
6. a fracture of the fourth metatarsal in his right foot;
7. a fracture of the left fibula;
8. and a small fracture of the medial malleolus of the left ankle.
Dr. Ford placed both of Saunier's legs in splints and his left elbow in a sling. Dr. Colpitts and Dr. Kober simultaneously operated on Saunier. Dr. Colpitts debrided and repaired Saunier's facial lacerations, while Dr. Kober debrided the laceration of Saunier's forearm and applied a skin graft to that area.
On November 10, 1988, Dr. Colpitts operated on Saunier for the LeForte II fracture. This procedure involved the application of "arch bars" and resulted in Saunier's jaw being immobilized for four or more weeks, during which time Saunier's diet *335 was restricted to liquids. Dr. Colpitts described the arch bars as being "just like heavy duty braces." Dr. Colpitts assigned a 2 percent disability of Saunier's entire body as a result of the injuries he treated.
Saunier was released from the hospital on November 12, 1988. On November 17, 1988, Dr. Ford placed a cast on Saunier's left leg and a walking brace on his right leg. Saunier was on crutches six to eight weeks. Dr. Ford told Saunier that he could attempt to bear weight on his legs as he could tolerate; however, Dr. Ford testified that with "fractures in both lower extremities, I knew it [sic] that it was going to be very difficult for him to be up and around; and it was probably four to six weeks following the accident that he had enough bony healing to allow him to be up and around fairly comfortably." His casts were removed on December 29, 1988.
Dr. Ford referred Saunier to Ronald Scott Duplechain, a physical therapist, to work on improving strength and motion in both ankles. Saunier initially saw Duplechain on December 30, 1988, and continued treatment with Duplechain every other day until February 15, 1989. Duplechain sent two progress reports to Dr. Ford during this time. In the last report, dated February 15, 1989, Duplechain noted that Saunier's mobility and agility were continuing to improve, but that Saunier's left knee was also causing problems due to pain and swelling. Duplechain testified at trial that "[a]s we began putting more pounding forces on the ankles and also the knees, then the left knee began to bother him somewhat then."
Saunier testified that from the time he was able to stand, his knees popped. Saunier testified that he did mention the popping in his knees to Dr. Ford, but that Dr. Ford did not seem concerned and told him that he was going to have that.
Dr. Ford did not have notes concerning Saunier's left knee complaints, nor did he render treatment in that respect. Dr. Ford released Saunier to return to work on March 23, 1989, and Saunier returned to Mobil as an onshore lease operator. Dr. Ford assigned a 5 per cent permanent partial disability to his left leg as a result of the left ankle injury.
On May 2, 1989, while fishing, Saunier began experiencing pain and swelling in his left knee after his knee shifted. Saunier stated that as he stood up in his boat and walked to the front of the boat, his left knee shifted. Saunier saw Dr. Ford on May 3, 1989, with complaints of pain and swelling in his left knee. Dr. Ford then referred Saunier to Dr. David Drez, an orthopedic surgeon who specializes in knee injuries.
Dr. Drez saw Saunier on May 10, 1989. He recommended an arthroscopy which was performed on May 25, 1989. Dr. Drez discovered that Saunier had a partial tear of the posterior cruciate ligament, a tear of two of the cartilages, and damage to the surface of the knee joint. Dr. Drez removed part of one of the cartilages and smoothed the surface of Saunier's knee joint, but he was not able to give Saunier's left knee the stability it had prior to the injury, or to reduce the amount of instability in that knee. He assigned a 35 percent permanent disability to Saunier's left leg as a result of this injury.
Saunier returned to work following the arthroscopy. While at work in September 1989, Saunier's left knee shifted and he fell between two steps, which resulted in a gash in his right knee. Saunier saw Dr. Drez on May 2, 1990 with problems with his right knee. Dr. Drez performed another arthroscopy on May 15, 1990 and found that Saunier had a tear of the meniscus as well as an arthritic condition in his right knee. Dr. Drez removed the torn part of the meniscus and smoothed out the roughness of the kneecap. Dr. Drez assigned a 15 per cent disability to Saunier's right lower leg as a result of the knee injury.
Following the helicopter crash, Saunier also began experiencing a fear of flying, nightmares, and feelings of guilt over having requested that two of his co-workers join him to assist him with his work on "West Cameron 609." Dr. Colpitts referred Saunier to Dr. Dale Archer, a psychiatrist. Dr. Archer initially saw Saunier on December 19, 1988, at which time Dr. *336 Archer wrote a letter to Mobil, stating that Saunier should not fly. He saw Saunier several times following the accident and eventually diagnosed Saunier as having an adjustment disorder. Dr. Archer treated Saunier with anti-depressant medication and referred Saunier to Dr. Albert Viguerie, a clinical social worker, for psychotherapy. Dr. Viguerie began working with Saunier in October 1989 and continued treating him through the date of trial.

OPINION

Causation of the Knee Injuries
Defendants contend that there is absolutely no evidence that Saunier injured his left knee in the helicopter accident, but they make no argument concerning Saunier's right knee injury. To support this contention, the defendants point out that Saunier had a history of knee problems and treatment prior to the helicopter accident, that Saunier was not diagnosed with the left knee injuries until May 1989 (six months after the helicopter accident), and that this diagnosis occurred after the boating incident.
Additionally, the defendants presented the testimony of Dr. Norman Paul Morin, an orthopedic surgeon who examined Saunier twice at the request of the defendants; Dr. Morin was of the opinion that the helicopter accident did not cause Saunier's left knee injuries, or at least was not the sole cause of these injuries.
Saunier did have a history of knee complaints prior to the helicopter accident. Dr. Drez saw Saunier twice in November 1985 for knee problems. At that time, Saunier gave a history of pain and swelling in his knees stating that his right knee had been hurting for about six years. Dr. Drez testified that Saunier also told Dr. Drez at that time that two other physicians had treated him with cortisone shots and medication. Dr. Drez testified that his exam at this time did not show anything specific. He observed swelling in the left knee joint and aspirated that joint. Dr. Drez testified that all of the work-up on the synovial fluid for the left knee was negative for inflammatory arthritis, with which he was mainly concerned. He testified that he treated Saunier with anti-inflammatory agents and that Saunier's symptoms cleared up. He did not see Saunier again until May 1989.
The defendants suggest that not only did Saunier have knee problems several years before the helicopter accident, but that these knee problems were ongoing, even at the time of the helicopter accident. Defendants urge that this is evidenced by a hospital record which contains a notation that Saunier stated that he was taking Feldene, an anti-inflammatory drug used in the treatment of knee injuries. At trial, Saunier denied that he was taking Feldene or any type of medication at the time of the helicopter accident. Saunier testified that at the time of the accident he was not having any problems with either of his knees.
Additionally, the defendants urge that the precipitating event, at least in part, of Saunier's left knee injuries was the boating incident in May of 1989. The defendants point out that Dr. Drez did not diagnose Saunier with knee injuries until immediately after the boating incident which was six months following the helicopter accident. Furthermore, although Dr. Ford treated Saunier for his orthopedic injuries following the helicopter accident, he had no notes of any knee problems before May 3, 1989. Also, although Duplechain, the physical therapist, testified that Saunier complained of popping and pain in his knee, and Duplechain issued a progress report to that effect in February 1989, Dr. Ford took no action concerning Saunier's knee at that time. We note that Saunier was not able "to be up and around fairly comfortably" due to his leg fractures, until four to six weeks following the accident. Additionally, Duplechain testified that as they began putting more pounding forces on Saunier's ankles and knees, Saunier's left knee began to bother him somewhat.
Finally, Dr. Morin was of the opinion that the symptoms regarding the torn ligament show that it was the boating incident that caused the posterior cruciate ligament tear, and that the difficulty Saunier began experiencing after the boating accident was *337 due to his previous knee problems. Dr. Morin testified that if Saunier's ligament was torn in the helicopter incident, a doctor would have seen swelling and Saunier would have complained of pain, and problems and complaints would have surfaced shortly after the incident.
It is well settled that the testimony of the treating physician is entitled to greater weight than the testimony of a physician who examined the patient only once or twice in preparation for litigation. McLaughlin v. Schwegmann Giant Supermarkets, Inc., 567 So.2d 165 (La.App. 4th Cir.1990).
Dr. Drez testified as follows:
"Q Given the history of him having been in a helicopter crash November 4, 1988, and I'll ask you to assume that his testimony was that he's had no problems with his knees since you treated him back in November of 1985, do you have an opinion as to what caused the damage to his left knee?
A Well, the problem which I found, I think that if someone were doing what he was doing walking up and down all the stairs, which I heard him talk about a minute ago; if they were doing all that, I think he would have been symptomatic, had he had the problem before the helicopter accident. And it's my opinion that that's what caused his problem.
Q Was the problem you found in 1989 any way related to what you saw in 1985?
A Well, I didn't see very much, because all I did was examine him. I didn't look inside the joint, but I don't think ... Had he had instability in his knee joint, I would have picked it up in '85. Had he had signs of meniscus pathology, I would have picked it up in '85; and he did not have any of those signs at that time.
Q And you also in '85 ran the lab tests that would have showed if he had arthritis, I think you said?
A Well, it wouldn't ... There's all different kinds of arthritis. It would have shown if he had rheumatoid arthritis, which is what I was concerned with primarily; and he did not have that."
Additionally Dr. Ford testified as follows:
"Q Based on the progress note that you have from Scott Duplechain, the therapist, the history of the helicopter crash, and the incident that Mr. Saunier reported to you in the boat, do you have an opinion as to the cause of the posterior cruciate ligament tear?
A In my opinion, the posterior cruciate ligament tear occurred in his accident, in his accident on the helicopter. The incident in the boat in no way was sufficient to cause a posterior cruciate ligament tear.
Q What type of ... If this is a fair question, what type of force or what amount of force does it take to tear the posterior cruciate ligament?
A It takes a significant amount of force, and it's almost always a ... It's almost always a blow to the front of the leg, as seen in football players with their foot planted and they receive a blow to the front of the leg, where the leg is driven backwards and the posterior cruciate ligament tears. There's really... That's almost universally the cause of a posterior cruciate ligament tear, as opposed to an anterior cruciate ligament tear."
Whether an accident caused a person's injuries is a question of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991). We find no manifest error in the jury's apparent conclusion of causation concerning the left knee injuries.
Concerning his right knee injury, Saunier does not claim that it was directly sustained in the helicopter accident. As we understand Saunier's position, the right knee injury is causally related to the helicopter accident because "but for" the left *338 knee injury, which was sustained in the helicopter accident, Saunier's left knee would not have shifted, thus he would not have fallen and injured his right knee.
Defendants did not address this issue in their brief, and the plaintiffs make but scant mention of it. We pretermit a discussion of the causation issue concerning the right knee injury; a determination either way would not convince us that the jury abused its discretion in its damages award to Saunier. The only item of damages that might be affected by a determination in this regard would be the award for medical expenses. However, the record before us is insufficient for us to determine whether expenses related to the right knee injury were awarded as medical expenses.

Pain and Suffering and Disability
The jury awarded Saunier $275,000 for physical and mental pain and suffering and $150,000 for physical disability. The defendants contend that the award for pain and suffering coupled with the award for disability, was an abuse of discretion. Furthermore, the defendants urge that the award for physical disability was repetitive and unsupported by the record.
As set forth above, Saunier sustained multiple injuries in the helicopter accident. Saunier underwent two operations immediately following the accident and an arthroscopy six months following the accident.
Not only were his injuries painful, but Saunier's jaw was immobilized for several weeks, and he was required to use crutches for several weeks. Saunier still experiences "slippage" in his left knee. He testified that he still suffers from his knee injuries because of the climbing and strain he puts on his knees at work. Additionally, his left ankle also continues to bother him.
Furthermore, Saunier suffered from depression, fear of flying, nightmares, and feelings of guilt after the accident. Saunier testified that he felt responsible for certain crew members being on board the helicopter, since he had requested that they go to assist him at the "West Cameron 609" platform. Dr. Viguerie was continuing to treat Saunier at the time of trial.
Concerning disability, Dr. Colpitts assigned a 2 percent disability for his body as a whole due to facial injuries, Dr. Ford assigned a 5 percent disability to Saunier's left leg, and Dr. Drez assigned a 35 percent disability to Saunier's left leg.
Saunier testified that before the accident, he had engaged in residential tree cutting since 1973, which he is not able to do now. Additionally, Saunier testified that he played slow pitch softball and water skied prior to the accident, which he is now unable to do. Mrs. Saunier testified that her husband's injuries have diminished activities they enjoyed doing together such as shopping and dancing.
In light of these facts, we cannot say that the jury abused its "much discretion" in its awards for pain and suffering and disability. We reject the defendants' claim of duplicity in these awards, since both elements of damages are supported by the record.

Loss of Consortium
The jury awarded Mrs. Saunier $50,000 for loss of consortium. As directed by Reck v. Stevens, 373 So.2d 498 (La.1979), we look first to the individual circumstances of this case. We examine the mass of prior awards as an aid in determining excessiveness. Having reviewed the individual circumstances of this case as well as awards in other cases, we hold that the jury's award to Mrs. Saunier is excessive.
Immediately following the helicopter accident, Mrs. Saunier attended to her husband's needs because he was unable to care for himself. Mrs. Saunier testified that she stayed at the hospital with her husband day and night following the helicopter accident. Mrs. Saunier also testified that when her husband returned home after his hospital stay, she did everything for him, such as washing his hair and bathing him. She stated that she prepared his food because he could not eat anything solid for six weeks, and she fed him at times because his hands were very shaky. Mrs. Saunier took care of Mr. Saunier's wounds and dressed them. She testified that she did most of these things for two to three weeks.
*339 Mrs. Saunier also testified that her husband could not drive for a couple of months after the accident, and that she saw that he got to all of his doctors appointments (sometimes three and four a week). She stated that after each of his surgeries, she always took care of all the yard work and any repairs that she could do. At trial, Mrs. Saunier testified that she still takes care of the yard work, and that Mr. Saunier had done some that summer. She stated that they had to hire someone to cut a tree in their front yard, which would have never happened before the accident.
Mrs. Saunier testified that the couple's marital relations returned to normal about two months after the accident. Dr. Viguerie testified that when he first saw Mr. Saunier in October of 1989, Saunier told him that the marriage was in good shape. Dr. Viguerie testified "[w]hat I remember is that he told me the marriage was in good shape. In fact, I'm not sure if I saw his wife the first time, but I did see her later, not individually but, in other words, along with him to see that that was so; that he did have good support in the family system." Dr. Archer's notes from May 2, 1990, contain an entry that Saunier told him that his marriage was doing well. At the time of the trial, the Sauniers' had been married for thirteen and one-half years.
Mrs. Saunier testified that her husband's injuries have impaired activities they used to enjoy doing together such as shopping and dancing. They no longer go to ball games because Mr. Saunier can no longer participate in them.
In Peter v. Allstate Ins. Co., 563 So.2d 1309, 1311 (La.App. 3d Cir.1990), we stated:
"[a]wards above $25,000.00 for loss of consortium have generally involved a permanent disruption in the marital relationship created by one spouse's severe, often disabling, injuries. See Mercer v. Fruehauf Corporation, 492 So.2d 538 (La.App. 3d Cir.1986), writ denied, 496 So.2d 350 (La.1986), $25,000.00 affirmed, where a spouse's deteriorating back condition caused a fear of paralysis and disruption of family life; Scott v. Hospital Service District No. 1, [496 So.2d 270 (La.1986) ], $50,000.00 affirmed, where a spouse's permanent vascular and orthopedic injuries produced a 100% functional disability; and Tracy v. Parish of Jefferson, 523 So.2d 266 (La.App. 5th Cir.1988), writ denied, 530 So.2d 569, reconsideration denied, 532 So.2d 141 (La.1988), $75,000.00 affirmed, where multiple injuries resulted in 55% to 60% permanent disability and the marriage deteriorated to the point where the wife required psychiatric care."
See also Landry v. Melancon, 558 So.2d 1143 (La.App. 1st Cir.1989), $50,000 affirmed, where the spouse sustained three herniated discs, chronic pain syndrome and depression which rendered spouse 100 percent disabled from a pain standpoint and 50 percent disabled from an anatomical standpoint and caused the couple's marital life to suffer; Humphries v. La. Dept. of Public Works, 545 So.2d 610 (La.App. 3d Cir.), writ denied 548 So.2d 1249 (La.1989), $75,000 affirmed, to the husband whose wife of thirty years died in an automobile accident; Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.), writ denied, 588 So.2d 1119 (La.1991), $60,000 awarded, where the husband's injuries produced in him feelings of inadequacies that greatly strained the marriage which almost led to a separation and required the couple to undergo marriage counseling, their sexual relationship was nonexistent for a time and remained affected by his permanent injuries, and the couple only rarely attended social functions or public gatherings; Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La.1988), $35,000 affirmed although the court noted that the award seemed generous, where the couple's "love life was now `nil'" and the husband was unable or unwilling to perform many small tasks that tend to produce a happy marriage; and Dill v. Department of Transportation and Development, 522 So.2d 1288 (La.App. 5th Cir. 1988), modified but not in relevant part, 545 So.2d 994 (La.1989), $30,000 affirmed, where due to the wife's injuries the husband lost her services at a time when the husband discovered he had cancer, the husband *340 had to undergo cancer surgery without his wife's assistance, and the husband was without his wife's assistance for his needs brought on by cancer for about one year. See Johnson v. Aetna Cas. & Sur. Co., 575 So.2d 458 (La.App. 3d Cir.), writ denied, 578 So.2d 934 (La.1991) in which we made an extensive review of loss of consortium awards.
Finding the award of $50,000 excessive under the facts of this case, we must reduce the award to the highest amount the jury could have reasonably awarded. In our opinion the highest amount the jury could have awarded was $25,000. For comparable awards, see Mercer v. Fruehauf Corp., 492 So.2d 538 (La.App. 3d Cir.), writ denied, 496 So.2d 350 (La.1986), $25,000 affirmed, where for a time the husband required the wife's assistance in almost every aspect of his daily life, the husband's condition began to deteriorate again requiring assistance after improving somewhat, the wife feared future surgery because of potential paralysis, and the family experienced significant life-style changes among other things; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990), $25,000 affirmed, where, as a result of his wife's injuries, the husband was forced to change his life-style, which impacted on the couple's personal relationship; Vaccaro v. Sports & Imports, Inc., 539 So.2d 989 (La. App. 4th Cir.), writ denied 541 So.2d 1391 (La.1989) and 541 So.2d 1392 (La.1989), $85,000 reduced to $25,000, where the injury did not intrude on the sexual relationship, there was minimal loss of the wife's services, and the wife's inability to attend several social functions did not constitute a serious deprivation of companionship; Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App. 2d Cir.1989), $75,000 reduced to $25,000 where among other things there was no evidence that the wife stopped loving her husband, sex life diminished, and the wife did not have to seek counsel from a psychiatrist; and American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991), $55,000 award by the trial court was reduced to $10,000 by the appellate court and raised to $25,000 by the supreme court, where the husband had taken over the household duties and child care, marital life suffered, and the couple's recreational and social activities were affected.

Loss of Future Earnings
The jury awarded Saunier $760,000 for loss of future earnings, and the trial court ordered a remittitur reducing that award to $200,000. The defendants allege that this $200,000 reformed judgment is excessive. Saunier alleges that the trial court did not have authority to consider a remittitur because the issue of quantum was not clearly and fairly separable from the other issues in the case and that, in any event, the trial court erred in ordering a remittitur since there was more than ample evidence to support the jury's award. Saunier urges that we must review the jury's award to determine whether it was reasonable, while the defendants urge that the appellate review is limited to the trial court's reformed judgment.

1.
We will initially address whether the trial court had the authority to enter a remittitur. LSA-C.C.P. art. 1814 provides in part that remittitur or additur "is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case." Saunier contends that the issues of causation and disability regarding Saunier's knees are so closely tied to loss of future earnings that it would seem that quantum is "not clearly and fairly separable from other issues in the case."
We disagree. In Miller v. Chicago Ins. Co., 320 So.2d 134 (La.1975), the defendant admitted liability, and the issue of quantum was tried before a jury. The jury awarded damages to the plaintiff, and the trial court ordered additur. At that time, LSA-C.C.P. art. 1813 (now C.C.P. art. 1814) provided that additur or remittitur could "be entered only if the amount of the excess or inadequacy of the verdict or judgment [could] be separately and fairly ascertained." Because of this language, it was argued that additur and remittitur were available only when an item of damages had been included or excluded from the judgment erroneously. The Louisiana Supreme Court held *341 that this was not the meaning of the phrase. The court held "[t]hus it is clear that it was not intended that additur and remittitur be available only when an item of damages can be isolated and found to have been erroneously included or excluded, but that additur and remittitur are available if the issue of quantum is clearly and fairly separable from other issues in the case." 320 So.2d at 139. Prior to the inclusion in LSA-C.C.P. art. 1814 of this language from Miller it was noted that "[t]he rule adopted by the court [in Miller] should apply where liability is stipulated or is ascertained in a separate trial, or where the quantum of damages is fixed by agreement or by law." Maraist, "Civil Procedure", 37 La.L.Rev. 528, 532. We do not think LSA-C.C.P. art. 1814 precludes use of remittitur in this case.
The Sauniers cite Ellis v. Allstate Ins. Co., 453 So.2d 1209 (La.App. 5th Cir.1984) in support of their position on this issue. In Ellis, the plaintiff filed suit for a determination of liability and damages arising out of an automobile collision. The jury returned an "in globo" award for damages, and the trial court increased the damage award. Our brethren in the fifth circuit held that additur was not appropriate, since the issue of quantum was not fairly separable from the degree of injury. The court stated that "[s]ince the jury damage award was an in globo award, it is impossible to discern what amounts the jury felt were appropriate for various items of damages. We find the issues of causation, degree of injury, and the amount of damages are not separable; therefore, an additur is not available in this case." 453 So.2d at 1215.
Recently in Davis v. State Farm Mutual Auto. Ins. Co., 590 So.2d 714 (La.App. 3d Cir.1991), relying on Ellis, supra, we rejected the plaintiff's argument that the trial court erred in denying her motion for additur or alternatively for a new trial. In Davis, the plaintiff also filed suit for a determination of liability and damages arising out of an automobile collision. As in Ellis, supra, the jury awarded a lump sum for damages. The trial court refused to order an additur or in the alternative a new trial. We affirmed the trial court's decision, holding that additur is not appropriate to increase a lump sum award because it is impossible to discern what amounts the jury believed were appropriate for various items of damage.
We find these cases distinguishable from the case at hand. In the case presently before us, the verdict sheet contained an itemization of the elements of damage awarded by the jury, making it clear which amounts the jury felt were appropriate for various items of damages.

2.
We now turn to the standard of review applicable to judgments reformed by remittitur or additur. LSA-C.C.P. art. 2083 was amended by Act 1989, No. 173, § 1 to include the following language:
"B. In reviewing a judgment reformed in accordance with a remittitur or additur, the court shall consider the reasonableness of the underlying jury verdict."
Prior to this amendment, the jurisprudence articulated the standard of review. In Miller, supra, the court held that, on appeal, review should be limited to the final judgment of the trial court, reflecting the additur or remittitur, to determine if that award was within the "much discretion" contemplated by LSA-C.C. art. 1934 (now 2324.1). The court expressly rejected the approach taken in Sukker v. Newsom, 264 So.2d 228 (La.App. 1st Cir.1972), which held that if the trial judge's award and the jury's award were both within the range of discretion of the trier of fact under LSA-C.C. art. 1934 (now 2324.1), then the trial judge's award was an abuse of his discretion, and the jury's award should be reinstated.
In Karl v. Amoco Production Co., 507 So.2d 263 (La.App. 3d Cir.), writ denied, 512 So.2d 461 (La.1987), this court followed Miller, supra, explaining that appellate review of a jury verdict reformed by an additur or a remittitur owes no deference to the jury verdict. "[T]he test applied to the reformed judgment is whether the judge was clearly wrong in his findings of fact, and whether the judge abused his discretion in making an award. In such a case, *342 the jury's decision is not considered at all." 507 So.2d at 266.
It appears to us that amended Article 2083(B) legislatively overrules Miller, Karl, and progeny. This article appears to set forth the standard articulated in Sukker, supra, such that the appellate court should review the jury's award for abuse of discretion, and the trial court abuses its discretion in granting remittitur when the jury's award is within the range of its discretion.

3.
We now turn to the facts of this case to review the jury's award of $760,000 for loss of future wages. At the time of trial, Saunier was thirty-seven years old and was working as an onshore lease operator for Mobil. The plaintiffs presented the testimony of Donald Cornwell, in support of their claim for this item of damages, and the defendants presented the testimony of Dr. Kenneth J. Boudreau.
Cornwell set forth several figures for the jury to determine loss of future earnings. According to Cornwell, these figures could be projected as follows:
1. Assuming that Saunier maintains his employment with Mobil as a lease operator until age 60.49 (the average age of retirement), his loss of future wages would be $203,903.57; this figure would be increased to $233,287.92 assuming Saunier retired at age 65 (Mobil's normal retirement age).
2. Assuming that Saunier leaves Mobil, attends vo-tech training for two years, and then enters the work force earning $15,787 a year, Saunier's loss of income would be $766,123.19 if Saunier worked until age 60; assuming Saunier worked until age 65, that figure would be $875,835.28. Both of these figures reflect total loss of wages past ($35,000) and future and include loss of fringe benefits.
3. Assuming Saunier leaves Mobil, attends college for four years, and then enters the work force at $21,618.03 a year, his loss of future earnings would be $710,020.05 if he works until age 60; this figure would be $802,560.16 if he works until age 65. Again, both figures reflect loss of past and future wages and include fringe benefits.
Dr. Boudreau's figures for loss of future income range from $70,000 to $91,000, which figures represent the difference between Saunier's income as a lease operator and his income as a meter tender.
After reviewing the record, we cannot say that the jury abused its discretion in its award for loss of future wages. This figure assumes that Saunier will be unable to continue his employment with Mobil. None of Saunier's physicians specifically restricted him from working at Mobil in his current position. However, Saunier's current job requirements involve his climbing 660 stairs on a routine type day according to Fred Aucoin, his supervisor, which puts stress on his knees. Dr. Drez testified as follows:
"A Well, first of all, I wouldn't put any restrictions on him at all. I'd tell him what he has and let him make his decision. I'd tell him what was bad and what would cause more wear in my opinion, and he has to make a judgment about whether or not he wants to do that. And it would be anything that increases the load. It's just like I said earlier; if he's aware of that, then he has to make the decision about whether or not he wants to do that activity or not.
Q Is his left knee still susceptible to giving out or slipping out of place?
A Probably.
Q Even with the brace on?
A It would be less likely, but it could still happen. Most of the reason why he'd have that feeling would be because I don't think he's going to be capable of rehabilitating the musculature about the knee joint to the point that it would withstand heavy demands.
Q You heard Mr. Saunier's testimony about the number of stairs that he's climbing on a regular basis?
A Yes.

*343 Q And you heard him say that he's climbing in excess of 560 stairs on a regular basis?
A I did.
Q What would be ... You know, is that something you would recommend that he do or that he avoid?
A That number of stairs seems like a lot of stairs to me. That's probably more than I climb in a month. I would think that if someone has ... or it would be my opinion that if someone's got the problems with his knee that I know he has that they would be avoiding that, because it puts greater than normal demands on the joint; and I would recommend, if they had a chance or choice, to do some other type of work.
Q What risk is he running, or, you know, what's a, I guess, a worse case scenario is he running by continuing to do that work and put those kind of demands on his legs?
A Well, I think what you're asking me, if chronologically I can give you a time of how long his knee is going to last; and I can't do that. But I can tell you that there is a greater chance of his joint wearing out more rapidly, if that's what he has been predetermined to happen to him, if he does those type of activities than if he were not to do it.
Q If his joint wears out, what's going to be necessary then?
A Well, it depends on how much pain he has. If he has substantial pain, such that it limits ... he can't do activities of daily living, then at present the best treatment for that is a joint replacement procedure.
Q Assuming he had to undergo a joint replacement or a knee replacement, would he be able to do the type of work that you heard him describe?
A No. The operation is only done for pain relief.
Q With his left knee, now, is that ... the condition his left knee is in and considering the activity that he does on a day to day basis, is that something that would cause him pain or you would expect to cause him pain?
A I wouldn't be surprised if he had pain.
Q And if he has swelling in his left knee or both knees at this time, is that an indication of anything to you?
A In my opinion, that's secondary to the arthritic problem which he has.
Q And the disabilities that you talked about for his left and his right knee, is that something that's going to improve?
A No."
Allen Grayson Simmons, a vocational rehabilitation expert, testified concerning Saunier's potential employment. He found Saunier highly proficient in his reading, math, and spelling abilities, with a very high aptitude pertaining to mechanical comprehension. Simmons also found Saunier's manual dexterity excellent and spacial discrimination skills above average. He was of the opinion that if Saunier could not continue his present job, he would definitely have a loss of earning capacity, but would be employable in several capacities. He stated that Saunier could be a small engine mechanic, a small engine repairer, a dispatcher, an entry level clerical worker, and that he had the capacity to be retrained for other occupations.
Concerning retraining, Simmons testified that if Saunier attended vo-tech school for two years, he could expect to make between $12,000 and $14,000 per year (entry level classification). Cornwell increased these figures to $15,787 per year, taking into consideration the rate of changes that would take place in starting salaries. Based upon these assumptions, Cornwell projected Saunier's loss of wages, with two years of vo-tech training, to be $766,123.19 or $875,833.08.
Simmons also testified that Saunier has a possibility of attending college, with some limitations. Simmons testified that Saunier could "go into a lot of college curriculums *344 [sic] and, I think, maintain fairly well." Simmons testified that if Saunier finished four years of college, he could expect to make between $14,000 and $17,000 per year (entry level salary). Cornwell increased this amount to $21,618.03, projecting a loss of income of $710,020.05 or $802,560.16.
We cannot say that the jury abused its discretion in awarding $760,000 to Saunier, although we might well have awarded a different amount. Inasmuch as we affirm the jury's award, the issues raised in the plaintiffs' alternative motion to remand and the defendants' motion to strike are moot.

Admission of Photographs
The defendants contend that the trial court erred in admitting certain photographs into evidence because they were irrelevant, or in the alternative, any probative value was outweighed by the prejudicial effect of the photographs. Specifically, the defendants objected to the introduction of plaintiffs' exhibits, "P-1", "P-11", "P-13", "P-23", "P-24", and "P-25".
"P-1" is a photograph of Saunier in the operating room, and it depicts facial lacerations sustained in the accident. "P-11" depicts Saunier wearing a knee brace on his left knee. "P-13" depicts entry wounds from the arthroscopic surgery performed on Saunier's left knee. "P-23" depicts the facial lacerations the day of or the day after the accident. "P-24" is a picture of Saunier with leg and elbow splints taken within the first three days after his accident. "P-25" depicts Saunier with walking casts taken three to four weeks after the accident.
The defendants urge that the content of the photographs had been presented to the jury through testimony and illustrations, such that the photographs were irrelevant and cumulative.
"Under La.Code Evid., art. 103(A), `error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected....' The jurisprudence interpreting the similar Fed.Rule Evid, 103(a) holds that rulings on admissibility of evidence are entrusted to the broad discretion of the trial judge, and such rulings will be reversed on appeal only if a substantial right of a party is affected, Muzyka v. Remington Arms Co., Inc., 774 F.2d 1309 (5th Cir.1985)."
Palmer v. Goudchaux/Maison Blanche, 588 So.2d 737, 740 (La.App. 5th Cir.1991), writ denied 590 So.2d 1186 (La.1992).
We do not find that the trial court abused its discretion in ruling that the photographs were relevant. The photographs have probative value in showing the jury the extent and severity of certain facial lacerations, as well as the devices and procedures used to diagnose, stabilize, or correct Saunier's injuries. We do not find the photographs inflammatory or prejudicial.

Plaintiffs' Closing Arguments
In their original brief, defendants specified as error the trial court's refusal to grant a mistrial after the plaintiffs' counsel suggested to the jury an allegedly impermissible method for calculating damages for pain and suffering and after the plaintiffs' counsel argued "loss of enjoyment of life" as an element of damage when this element was not listed on the verdict sheet. However, the defendants did not brief these issues in their original brief. Instead, defendants stated in their original brief that they would "submit a supplemental brief in this regard when the transcription of the attorneys' closing arguments is made available by the trial court recorder [sic]."
Defendants filed their original brief on September 5, 1991. On October 23, 1991, after obtaining an extension, defendants filed a reply brief. On January 16, 1992, defendants filed a supplemental brief in which they addressed the issues concerning plaintiffs' closing arguments.
Plaintiffs then filed a motion to strike the supplemental brief. Plaintiffs based their motion to strike on alleged noncompliance with the rules of this court of appeal governing filing of reply briefs. Defendants opposed the motion. No profit will result from a discussion of the spirited controversy engaged in on this matter by counsel for the parties for the reason that we find no merit to the specification of *345 errors dealt with in defendants' supplemental brief.
The following is an excerpt from the plaintiffs' closing arguments:
"Probably a way that I think through it is if you can imagine if you picked up a newspaper in the morning and looked under the want ad section and they had an ad in there that said wanted, someone to do the following things and it said, you know, no regular hours; you don't have to report for work; you don't have to do paperwork; all you have to do is agree to go through a helicopter crash, just like Mr. Saunier did; end up initially in that condition; end up wearing a leg brace on your left knee for the rest of your life; end up with all the injuries that we heard, the cut above his left eye, the fracture that caused him to have his mouth wired together for about six weeks, the broken nose, the broken ... I think they called it orbital (unintelligible) of the left eye, all of the cuts, the chest problem, the break to his left elbow, the cut to his left arm, the break to his left leg, the toe on his right foot, and, probably most importantly, the left ankle, the left knee, and the right knee. All you have to do is agree to have those injuries and suffer with them for the rest of your life, and once you take the job you can never get out of it. And let's say that the job says it pays $50.00 an hour ... $50.00 a day, rather. I don't think anybody would apply for the job. The problem is Mr. Saunier got the job. He didn't apply for it, but he got it; and he got it for the rest of his life. He's not going to be able to participate in sports like he did before; he can't do tree cutting; he can't do some of the things he did with his wife; and things that he can still do, he's limited. And I think $50.00 a day is high; I'll tell you that; but if you look at his life expectancy, which is 38.66 years today ... He's already suffered with this for a couple of years, so let's just say forty years. I figured it out on paper awhile ago at $25.00 a day ...
MR. COLLINS: Your Honor, that's improper argument. That's an improper method of stating damages ...
THE COURT: That's correct.
MR. COLLINS: And I would ask for a mistrial at this time.
THE COURT: Ladies and gentlemen of the jury, I'm going to deny the motion for mistrial, but that's not a proper way to come up with that particular figure. So, Mr. Broussard, don't pursue that, please.
MR. BROUSSARD: Yes, Your Honor. At any rate, I'm about to run out of time. You know everything he went through. And I'm going to lump it all together for you, his loss of enjoyment of life, his past, present, and future wage loss ...
MR. COLLINS: Your Honor, that is not an element of damages that you're going to charge the jury on, loss of enjoyment of life; and I again move for a mistrial. This gentleman read the jury charges and knew them.
THE COURT: That's correct. Mistrial denied. Loss of enjoyment of life is not an element of damages that's included in my charges to the jury or on the verdict sheet.
MR. BROUSSARD: I'll strike it off, Your Honor, and I apologize."
The exchange between counsel and the trial judge quoted from the transcript above poses two questions: (1) the propriety of a "unit of time" argument, usually engaged in for the purpose of persuading a jury to make a liberal award for pain and suffering, and (2) the question of whether loss of enjoyment of life is a compensable item of damages. Counsel for defendants made separate objections and moved for a mistrial on each point. The trial judge denied both motions. The trial judge instructed the jury to the effect that the "unit of time" argument quoted above was "not a proper way to come up with that particular figure," the particular figure being the amount to be awarded for pain and suffering.
We will consider the second question first. The trial judge did not say that loss of enjoyment of life is not a compensable element of damages, only that it was not an element of damages included in the *346 charges he intended to give to the jury. The trial judge may have taken this position because he considered that loss of enjoyment of life was included in mental pain and suffering. The verdict sheet lists item (a) for Mr. Saunier as "Pain and suffering; both physical and mental." However, Saunier's counsel in his brief attacks the ruling as incorrectly holding that loss of enjoyment of life is not a compensable element of damages. Without charging the trial judge with error, we will simply say that loss of enjoyment of life is a compensable element of damages. It is merely a matter to be distinguished from other elements such as pain and suffering and disability. Foster v. Trafalgar House Oil & Gas, 603 So.2d 284 (La.App.2d Cir. 1992). Andrews v. Mosley Well Service, 514 So.2d 491, 498 (La.App. 3d Cir.), writ denied, 515 So.2d 807 (La.1987).
It is quite possible that the breaking down of general damages can be overworked. A trial judge should be alert to properly instruct a jury so that abuse and unfairness do not result. This caveat applies both to instructions to juries and preparation of jury verdict sheets. We have already held in this opinion that it was not improper for the trial judge in his opinion to list pain and suffering and disability as separate items. On the other hand, we have held that there is no requirement for a breakdown of general damages into specific items. Deshotel v. South La. Contractors, Inc., 484 So.2d 155 (La.App. 3d Cir.), writ denied, 493 So.2d 635 (La. 1986), opinion reinstated, 487 So.2d 789 (La.App. 3d Cir.).
We find it interesting that Louisiana Jury Instructions published by the Louisiana Association of Defense Counsel, Third Edition, 1989, edited by Professor Frank Maraist and Professor Tom Galligan contains at pages sixty-four and sixty-five the following language (footnote omitted) in the suggested general charge for compensatory damages:
"In making an award of compensatory damages, you should consider the following elements of damage, to the extent you find them proved by a preponderance of the evidence, and no others:
"Any bodily injury sustained by the Plaintiff and any resulting pain and suffering, disability, mental anguish and loss of capacity for the enjoyment of life experienced in the past or to be experienced in the future. No evidence of the value of such intangible things as mental or physical pain and suffering has been or need be introduced. In that respect it is not value you are trying to determine, but an amount that will fairly compensate the Plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any such award should be fair and just in the light of the evidence."
Nevertheless, we reiterate that the trial judge in a jury case should exercise his sound judgment so as not to mislead the jury and to avoid the possibility of duplicity. See, for example, the comments in the dissent in Andrews v. Mosley Well Service, supra.
Having made these comments, we find the general damages totaling $425,000, to be adequate. Hence, we doubt that plaintiffs were prejudiced in anyway. Moreover, plaintiffs' counsel made no objection to the trial judge's comment and ruling. On the contrary he appears to have acquiesced in it.
We now move to the "unit of time" closing argument issue. Preliminarily, we note that, just as we observed above that the damages awarded were adequate, we also do not find that they were excessive. Hence, if a "unit of time" argument is improper, the trial judge's admonition to the jury sufficed to cure the impropriety. See Streeter v. Sears, Roebuck & Co., Inc., 533 So.2d 54 (La.App. 3d Cir.1988), writ denied, 536 So.2d 1255 (La.1989); Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976).
Accordingly, we deny the motion to strike defendants' supplemental brief, and we find defendants' arguments on this issue to be without merit.

CONCLUSION
For the foregoing reasons, we reverse the trial court's reformed judgment dated *347 March 1, 1991 ordering a remittitur respecting the damages awarded Randolphe Jimmie Saunier. We reinstate the jury verdict as originally rendered, and as thus amended, we affirm the judgment in his favor for the full amount of the jury award.
The judgment in favor of Rhonda Saunier is amended to reduce the award of damages in her favor to the sum of $25,000; as thus amended the judgment in favor of Rhonda Saunier is affirmed.
The costs of this appeal are assessed 90% to defendants and 10% to plaintiff-appellee, Rhonda Saunier.
REVERSED IN PART: AMENDED IN PART and AFFIRMED AS REVISED and AMENDED.
NOTES
[*] Honorable Joseph E. Coreil, retired, participated in this decision by the appointment of the Louisiana Supreme Court as Judge Pro Tempore.